ERIC GRANT
United States Attorney
MATTHEW THUESEN
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

MARGARET A. MOESER
Chief, Money Laundering and Asset Recovery Section
Criminal Division, U.S. Department of Justice
KEVIN G. MOSLEY
EMILY COHEN
CAYLEE E. CAMPBELL
Trial Attorneys
1400 New York Ave NW
Washington, D.C. 20005
Telephone: (202) 514-1263

Attorneys for Plaintiff
United States of America

**FILED**

Oct 08, 2025

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

## IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.   2:25-cr-0235 JAM |
| Plaintiff, | 18 U.S.C. § 371 – Conspiracy to Willfully Fail to Maintain an Effective Anti-Money Laundering Program; 18 U.S.C. § 371 – Conspiracy to Operate an Unlicensed Money Transmitting Business; 18 U.S.C. § 371 – Conspiracy to Violate the Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises Act |
| v. | |
| PAXFUL HOLDINGS, INC., | |
| Defendant. | |

I N F O R M A T I O N

**INTRODUCTORY ALLEGATIONS**

At all relevant times:

///

///

***Entities and Individuals***

1.      Paxful, Inc., was established and registered as a corporation in Delaware on or about July 17, 2015. Co-conspirator 1 and Artur Schaback, charged elsewhere, founded, owned, controlled, and maintained Paxful, Inc., which they used to operate the Paxful virtual currency marketplace. Co-conspirator 1 was the President and Chief Executive Officer of Paxful, Inc., and Schaback was, at various times, the Chief Technology Officer, Chief Operating Officer, and Chief Product Officer of Paxful, Inc.

2.      On or about June 5, 2019, Co-conspirator 1 and Schaback established and registered in Delaware PAXFUL HOLDINGS, INC. Through PAXFUL HOLDINGS, INC., Co-conspirator 1 and Schaback absorbed, established, registered, and controlled subsidiary companies, including but not limited to Paxful, Inc. Co-conspirator 1 and Schaback used PAXFUL HOLDINGS, INC., and its subsidiaries to conduct Paxful operations. Co-conspirator 1 and Schaback served as the sole board members of PAXFUL HOLDINGS, INC., held nearly all PAXFUL HOLDINGS, INC.'s common stock, and assumed leadership roles with decision-making authority within PAXFUL HOLDINGS, INC.

***Legal Background***

3.      By operating wholly or in substantial part within the United States, Paxful, Inc., was a financial institution within the meaning of 31 U.S.C. § 5312 and was required to comply with the requirements of the Bank Secrecy Act ("BSA"), codified at 31 U.S.C. § 5311 et seq., and its implementing regulations. Specifically, Paxful, Inc., constituted a money transmitting business ("MTB") under 31 U.S.C. § 5312(a)(2)(R) as a "sender of money or any other person who engages as a business in the transmission of currency, funds, or value that substitutes for currency, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside the conventional financial institutions system." Under the BSA, because Paxful, Inc., was an MTB, or a "person that provides money transmission services," it also constituted a money services business ("MSB").

4.      The BSA was designed to prevent, detect, and combat international money laundering and the financing of terrorism. 31 U.S.C. § 5311. The BSA imposed reporting, recordkeeping, and controls requirements on covered "financial institutions," which included MTBs, that were required to

register with the Secretary of the Treasury. 31 U.S.C. § 5330.

5.      Under the BSA, within 90 days of the date the business was established, an MTB was required to establish an effective anti-money laundering ("AML") program that included, at a minimum: the development of internal policies, procedures, and controls; the designation of a compliance officer; an ongoing employee training program; and an independent audit function to test programs. *See* 31 U.S.C. § 5318(h)(1). MTBs also were required to file suspicious activity reports ("SARs"), including for transactions involving or aggregating at least $2,000 if the MTB knew, suspected, or had reason to suspect, among other things, that the transaction involved funds derived from illegal activity or that the MTB was being used to facilitate criminal activity. *See* 31 U.S.C. § 5318(g); 31 C.F.R. § 1022.320.

6.      As a part of its AML program, an MTB was required to implement a written KYC program that included risk-based procedures for verifying the identity of each customer to the extent reasonable and practicable. At a minimum, the KYC program was required to collect the name, date of birth, address, and other identifying information of each customer prior to account opening and take steps to verify that information in a reasonable time. The KYC program also was required to include procedures for determining whether a customer appeared on any list of known or suspected terrorists or terrorist organizations issued by any federal government agency. *See* 31 U.S.C. § 5318(l); 31 C.F.R. § 1022.210.

7.      The Travel Act, codified at 18 U.S.C. § 1952, prohibited, among other things, the use of any facility in interstate or foreign commerce with intent to otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, including any business enterprise involving prostitution offenses in violation of the laws of the State in which committed or of the United States.

8.      The State of California criminalized the following prostitution offenses: California Penal Code §§ 647(b)(1)–(2) (soliciting or agreeing to engage in prostitution), 266h(a) (knowingly living or deriving support from earnings or proceeds of prostitution), and 266i(a)(1)–(a)(2) (procuring for, or, by any device or scheme, inducing, persuading, or encouraging a person to commit an act of prostitution).

9. The following constituted facilities in interstate and/or foreign commerce under the Travel Act: (1) the Internet, including but not limited to websites such as www.paxful.com, www.backpage.com, and Internet Website 1; (2) Internet enabled communications software; (3) Internet service providers; and (4) phones.

10. From at least in or around 2015 through in or around April 2018, www.backpage.com hosted a variety of advertising categories, including an "adult" section, where users could pay to post advertisements for "adult jobs," "therapeutic massages," "escorts," and "body rubs." The website, and particularly its adult advertising pages, were commonly used to promote commercial sex throughout the United States. In various criminal proceedings, Backpage and its owners and operators admitted that Backpage advertised and profited from illegal prostitution, including illegal sex work depicting minors. In or around July 2015, major credit card companies, including Visa, Mastercard, and American Express, stopped processing transactions for adult services advertisements on backpage.com. The website subsequently accepted virtual currency as a payment method. On or about April 6, 2018, federal authorities seized and shut down www.backpage.com and its affiliated websites as part of a criminal investigation.

11. From at least in or around April 2018, and continuing to at least December 2022, Internet Website 1, similarly allowed users to pay to post advertisements for adult services and was used to promote commercial sex, including in the United States. Internet Website 1 was described online as a site similar to www.backpage.com or an alternative to www.backpage.com. Like www.backpage.com, Internet Website 1 accepted virtual currency as payment for advertisements.

### The Paxful Virtual Currency Marketplace

12. Paxful was a peer-to-peer virtual currency marketplace available on the website www.paxful.com.

13. Paxful offered customers in the United States and elsewhere a variety of services related to virtual currency, including money transmitting services. Primarily, Paxful served as an online trading market where customers with Paxful accounts negotiated for and traded in virtual currency, such as bitcoin, in exchange for other financial instruments, including gift cards, pre-paid cards, and fiat currency.

14. To facilitate trades on behalf of customers, Paxful maintained virtual currency wallets known as "escrow wallets," which were used to accept and hold customers' virtual currency until a trade was confirmed. Once confirmed by the necessary customers, Paxful directed and caused the release of virtual currency from the escrow wallet to the appropriate customer's Paxful account.

15. In addition to the virtual marketplace, Paxful offered customers the ability to store virtual currency in their Paxful accounts, transfer virtual currency to and from other Paxful accounts, and transfer virtual currency from Paxful accounts to external accounts, including those belonging to third-party vendors. Paxful collaborated with third-party vendors, including by integrating "Pay With Paxful" widgets (components of an interface, such as a "button," that enable certain functions when clicked) on third-party websites to direct customers to Paxful for payment services. Upon instruction from customers seeking to send virtual currency to an external account, Paxful directed and caused the release of virtual currency from the escrow wallet to the designated external account.

16. Paxful collected fees related to its escrow and transfer services, including percentage fees for trades facilitated over the online marketplace, fees for certain internal transfers between Paxful customer accounts, and fees for external send-outs, such as those destined for third parties. The amount of each fee depended on the type of trade and payment method, the number of internal transfers conducted, and the dollar value of the external send-out.

17. Through Paxful, PAXFUL HOLDINGS, INC., and its co-conspirators engaged in, facilitated, and profited from the national and international transfer of user funds, including throughout the United States and within the State and Eastern District of California.

COUNT ONE: [18 U.S.C. § 371 – Conspiracy to Willfully Fail to Maintain an Effective Anti-Money Laundering Program]

The United States charges:

PAXFUL HOLDINGS, INC.,

defendant herein, as follows:

1. Paragraphs 1 through 17 of Introductory Allegations of this Information are realleged and incorporated herein.

THE CONSPIRACY

2.      From in or around July 2015, through in or around at least November 2019, in the State and Eastern District of California and elsewhere, the defendant, PAXFUL HOLDINGS, INC., Co-conspirator 1, and Schaback knowingly and willfully combined, conspired, confederated, and agreed with each other and others known and unknown to the United States to commit an offense against the United States, that is, to willfully fail to establish, develop, implement, and maintain an effective AML program, commensurate with the risks posed by the location and size of, and the nature and volume of the financial services provided by the MTB, that is, Paxful, Inc., that were reasonably designed to prevent the MTB from being used to facilitate money laundering and the financing of terrorist activities, and including, at a minimum—(A) the development of internal policies, procedures, and controls; (B) the designation of a compliance officer; (C) an ongoing employee training program; and (D) an independent audit function to test programs, in violation of the BSA, specifically, 31 U.S.C. §§ 5318(h)(1)-(2) and 5322.

MANNER AND MEANS

The manner and means by which PAXFUL HOLDINGS, INC., Co-conspirator 1, Schaback, and others sought to accomplish the object of the conspiracy included, among others, the following:

3.      Co-conspirator 1 and Schaback established and registered multiple companies for the purpose of operating Paxful.

4.      PAXFUL HOLDINGS, INC., Co-conspirator 1, and Schaback controlled Paxful, including www.paxful.com, and made executive decisions regarding Paxful's operations.

5.      PAXFUL HOLDINGS, INC., Co-conspirator 1, and Schaback designed, intended, and operated Paxful to accept funds from customers around the world, including in the United States, and to facilitate the transfer of such funds, including virtual currency, between, among, and on behalf of Paxful customers.

6.      PAXFUL HOLDINGS, INC., Co-conspirator 1, and Schaback contracted with a digital asset trust company located in the United States to assist in the transfer of virtual currency on behalf of Paxful customers by using the digital asset trust company as a third-party custodian of Paxful's virtual currency escrow wallet(s), which accepted, stored, and transferred Paxful customer virtual currency.

7.     PAXFUL HOLDINGS, INC., Co-conspirator 1, and Schaback maintained control of one of the private keys—a key required to access and manage virtual currency within a wallet—to the escrow wallet(s) and, accordingly, maintained control over the transfer of virtual currency from those same wallet(s).

8.     PAXFUL HOLDINGS, INC., Co-conspirator 1, Schaback, and others willfully failed to implement and maintain policies, procedures, and internal controls reasonably designed to assure compliance with the BSA for: (1) an effective AML program; (2) verifying customer identification; (3) filing SARs; (4) designating a person to assure day-to-day compliance with the AML program, including by properly filing reports, creating and retaining records, updating the program as necessary, and providing appropriate training and education; (5) providing for independent audit functions to test the AML program; and (6) providing training for appropriate personnel. For example, PAXFUL HOLDINGS, INC., Co-conspirator 1, Schaback, and others:

a.     Allowed customers to open Paxful accounts and trade on www.paxful.com without providing sufficient identifying information or documents to allow Paxful, Inc., to verify the true identities of its customers;

b.     Marketed Paxful to customers as a platform that did not require KYC and/or that allowed "buying without ID;"

c.     Facilitated the transfer of funds between customers without conducting KYC, despite knowing Paxful was required to do so;

d.     Misled financial institutions and companies about their AML program, knowing that their AML program was non-existent and insufficient and that this information was material to the other financial institutions and companies;

e.     Failed to establish AML and KYC policies and procedures to monitor customer transactions for money laundering, sanctions violations, illegal prostitution, and terrorist funding, among other criminal activity;

f.     Presented an AML program that was copied from another company to third parties, knowing that the stated programs were not implemented at Paxful, which did not have an AML program;

g.    Made exceptions to AML and KYC policies based on Paxful customers' trading volumes and their relationships with Co-conspirator 1 and Schaback;

h.    Failed, until in or around November 2018, to designate a compliance officer to ensure day-to-day compliance with AML and KYC programs;

i.    Failed, until in or around June 2019, to provide training to employees related to AML and KYC;

j.    Failed, until in or around November 2019, to file a single SAR, despite knowing that Paxful customers conducted suspicious and criminal activity, including money laundering, and despite receiving law enforcement and public requests related to such activity; and

k.    Failed, until in or around September 2020, to provide for independent compliance testing or auditing for AML.

<u>OVERT ACTS</u>

In furtherance of the conspiracy, and to accomplish its object and purposes, at least one of the conspirators committed, or caused to be committed, in the Eastern District of California and elsewhere, the following overt acts, among others:

9.    On or about August 15, 2016, Co-conspirator 1 sent an AML policy, which had been adapted from the AML policy of a university and which, in fact, PAXFUL HOLDINGS, INC., Co-conspirator 1, and Schaback did not implement or enforce at Paxful, Inc., to a separate virtual currency exchange where they sought to open an account.

10.    On or about January 9, 2017, Co-conspirator 1 completed an application to open an account at another virtual currency exchange, in which he falsely claimed, among other things, that Paxful assessed its customers' AML policies and procedures, collected KYC information, conducted transaction monitoring, and provided its employees with AML training.

11.    On or about February 17, 2017, PAXFUL HOLDINGS, INC., Co-conspirator 1, and Schaback sent or caused to be sent an updated AML policy, which they did not, in fact, implement or enforce at Paxful, Inc., to a separate virtual currency exchange that had criticized a prior version of Paxful, Inc.'s purported AML policy.

12.     On or about April 14, 2017, Schaback sent an email to a prospective Paxful customer sharing the benefits of Paxful in which he stated that trades were "instant and anonymous whereas with exchanges you have to KYC yourself and wait 5 days for bitcoins to arrive" and noted that gift cards, cash deposits, and Western Union deposits had markups up to 20 percent but were "instant and anonymous."

13.     On or about December 17, 2017, Schaback sent an internal communication to Co-conspirator 1 stating that Paxful, Inc., should not conduct KYC on "small amount buyers."

14.     On or about the dates listed below, PAXFUL HOLDINGS, INC., Co-conspirator 1, Schaback, and others allowed undercover law enforcement located within the Eastern District of California to open Paxful accounts and conduct trades on Paxful without requiring or receiving any identification or other KYC information beyond a name and email address:

| Account Opening/Transaction Date | Account Name |
| --- | --- |
| Opening: October 14, 2016 | snowbunnyman |
| Transaction: October 26, 2016 | snowbunnyman |
| Transaction: November 30, 2016 | snowbunnyman |
| Opening: April 1, 2019 | Dr.Frosty |
| Opening: April 8, 2019 | Therealpureheroin |
| Transaction: September 23, 2019 | Therealpureheroin |

15.     On or about October 18, 2019, PAXFUL HOLDINGS, INC., Co-conspirator 1, Schaback, and others allowed undercover law enforcement located within the Eastern District of California to use the Paxful account "Therealpureheroin," which Paxful permitted to be opened without KYC, to complete a bitcoin sale despite explicitly referencing selling heroin on the dark net market with the buyer.

///

///

///

16.     Until on or about November 26, 2019, PAXFUL HOLDINGS, INC., processed transactions for illegal prostitution and transactions suspected to derive from or perpetuate fraud schemes, among other illicit activity, without filing a single suspicious activity report.

All in violation of Title 18, United States Code, Section 371.

COUNT TWO: [18 U.S.C. § 371 – Conspiracy to Operate an Unlicensed Money Transmitting Business]

The United States charges:

PAXFUL HOLDINGS, INC.,

defendant herein, as follows:

1.     Paragraphs 1 through 17 of Introductory Allegations of this Information are realleged and incorporated herein.

THE CONSPIRACY

2.     From on or around July 2015, through in or around at least December 2022, in the State and Eastern District of California, and elsewhere, the defendant, PAXFUL HOLDINGS, INC., Co-conspirator 1, and Schaback knowingly and willfully combined, conspired, confederated, and agreed with each other and others known and unknown to the United States to commit an offense against the United States, that is, to knowingly conduct, control, manage, supervise, direct, and own all or part of an unlicensed MTB, that is an MTB that involves the transportation and transmission of funds that are known to PAXFUL HOLDINGS, INC., to have been derived from a criminal offense and are intended to be used to promote or support unlawful activity, in violation of Title 18, United States Code, Sections 1960(a) and 1960(b)(1)(C).

MANNER AND MEANS

The manner and means by which the PAXFUL HOLDINGS, INC., Co-conspirator 1, Schaback, and others sought to accomplish the object of the conspiracy included, among others, the following:

3.     Paragraphs 3 through 8 of Count One of this Information are realleged and incorporated herein.

4.     Members of the conspiracy sought to do business with websites they knew were engaged in advertising illegal prostitution and commercial sex services in the United States, including www.backpage.com and Internet Website 1, among other similar sites.

5.    Members of the conspiracy communicated with customers of www.backpage.com to assist them in opening Paxful accounts from which they could send bitcoin to www.backpage.com for commercial sex advertisements.

6.    Members of the conspiracy communicated about and knowingly facilitated transfers of funds on behalf of customers seeking to send virtual currency to www.backpage.com, Internet Website 1, and similar sites, to pay for commercial sex advertisements.

7.    Members of the conspiracy communicated about and knowingly facilitated transfers of funds derived from other unlawful activity, including illegal prostitution and fraud schemes and scams.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its object and purposes, at least one of the conspirators committed, or caused to be committed, in the Eastern District of California and elsewhere, the following overt acts, among others:

8.    On or about July 17, 2015, Co-conspirator 1 and Schaback established and registered in the State of Delaware the corporation "Paxful, Inc.," which they used to operate Paxful.

9.    On or about July 22, 2015, Co-conspirator 1 sent an email to www.backpage.com executives listing recommendations to increase conversion rates, that is, the number of customers that switch to using virtual currency, and providing a link, http://blog.paxful.com/how-to-buy-bitcoin-for-backpage/, to a guide Paxful prepared for www.backpage.com customers.

10.    In or around August 2015, PAXFUL HOLDINGS, INC., Co-conspirator 1, Schaback, and others integrated a "Pay With Paxful" widget onto www.backpage.com.

11.    In or around March 2016, Paxful, Inc., Co-conspirator 1, and Schaback entered an agreement with Digital Asset Trust Company 1 for custodial services related to maintaining Paxful's escrow account(s).

12.    On or about the dates listed below, employees of Paxful engaged in conversations with individuals they believed to be Paxful customers, but who, in fact, were undercover law enforcement agents located within the Eastern District of California, about using Paxful in connection with www.backpage.com, Internet Website 1, and commercial sex advertisements:

| Date | Conversation |
|------|--------------|
| October 14, 2016 | An employee of Paxful, Inc. provided advice to an undercover law enforcement agent on how to use bitcoin to post an advertisement on www.backpage.com. |
| November 22, 2016 | An employee of Paxful, Inc. provided advice to an undercover law enforcement agent about how to contact www.backpage.com to discuss advertisements. In or around one week later, the undercover agent created a fake prostitution advertisement and posted it on www.backpage.com using the "Pay With Paxful" widget and bitcoin from a Paxful account. |
| June 8, 2018 | An employee of Paxful, Inc. discussed how to dispute a trade with an undercover law enforcement agent who disclosed that the trade was related to paying for advertisements on Internet Website 1. |

13.     On or about June 5, 2019, Co-conspirator 1 and Schaback established and registered in the State of Delaware the corporation "PAXFUL HOLDINGS INC.," which they used to control Paxful, Inc., and to operate Paxful.

14.     On or about the dates listed below, Paxful directed and caused the transfer of virtual currency from Paxful to a wallet address associated with Internet Website 1:

| Date | Virtual Currency Transferred |
|------|------------------------------|
| December 18, 2022 | 0.0034 bitcoin |
| December 20, 2022 | 0.0072 bitcoin |
| December 29, 2022 | 0.003917 bitcoin |

All in violation of Title 18, United States Code, Section 371.

COUNT THREE: [18 U.S.C. § 371 – Conspiracy to Violate the Travel Act]

The United States charges:

PAXFUL HOLDINGS, INC.,

defendant herein, as follows:

1.     Paragraphs 1 through 17 of Introductory Allegations of this Information are realleged and incorporated herein.

THE CONSPIRACY

2.      From in or around July 2015, through at least in or around December 2022, in the State and Eastern District of California and elsewhere, the defendant, PAXFUL HOLDINGS, INC., Co-conspirator 1, and Schaback knowingly and willfully combined, conspired, confederated, and agreed with each other and others known and unknown to the United States to commit an offense against the United States, that is, to use and cause to be used a facility in interstate and foreign commerce, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, that is, a business enterprise involving prostitution, in violation of the laws of the State of California, and thereafter perform and attempt to perform an act to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of such unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3).

MANNER AND MEANS

The manner and means by which PAXFUL HOLDINGS, INC., Co-conspirator 1, Schaback, and others sought to accomplish the object of the conspiracy included, among others, the following:

3.      Paragraphs 3 through 7 of Count Two of this Information are realleged and incorporated herein.

4.      Members of the conspiracy communicated with www.backpage.com employees, including over email, about ways to improve their business collaboration.

5.      Members of the conspiracy created and disseminated guides for customers associated with www.backpage.com, instructing them on how to use Paxful to purchase bitcoin to send to www.backpage.com.

6.      Members of the conspiracy created a "landing page" on Paxful's website for customers seeking payment services for commercial sex advertisements on www.backpage.com.

7.      Members of the conspiracy integrated the "Pay with Paxful" widget onto www.backpage.com to streamline the users' connection to www.paxful.com.

8.      Members of the conspiracy allowed customers seeking to send virtual currency to www.backpage.com and Internet Website 1 to open accounts and transmit bitcoin to the sites for commercial sex advertisements.

9.      Members of the conspiracy used the Internet to accept, store, and transfer virtual currency on behalf of Paxful users to wallets controlled by the websites engaged in advertising prostitution, including www.backpage.com Internet Website 1.

10.     As a result of PAXFUL HOLDINGS, INC., and its co-conspirators' payment processing for the advertising websites, Paxful facilitated the transfer of over $15 million worth of virtual currency from its escrow wallet to www.backpage.com and over $2 million worth of virtual currency from its escrow wallet to Internet Website 1 on behalf of Paxful customers.

<u>OVERT ACTS</u>

In furtherance of the conspiracy, and to accomplish its object and purposes, at least one of the conspirators committed, or caused to be committed, in the Eastern District of California and elsewhere, the following overt acts, among others:

11.     On or about July 22, 2015, Co-conspirator 1 sent an email to www.backpage.com executives listing recommendations to increase conversion rates, that is, the number of customers that switch to using virtual currency, and providing a link, http://blog.paxful.com/how-to-buy-bitcoin-for-backpage/, to a guide Paxful prepared for www.backpage.com customers.

12.     In or around 2015, PAXFUL HOLDINGS, INC., Co-conspirator 1, Schaback, and others created a landing page at https://paxful.com/backpage for www.backpage.com customers using Paxful.

13.     In or around August 2015, PAXFUL HOLDINGS, INC., Co-conspirator 1 and Schaback, and others integrated a "Pay With Paxful" widget onto www.backpage.com.

14.     In or around April 2018, a member of the conspiracy conducted website analysis on Internet Website 1 to determine the level of traffic and engagement Internet Website 1 was sending to Paxful.

15.     On or about May 15, 2018, a Paxful employee forwarded an email to two other Paxful employees showing his conversation with an individual associated with a website, similar to www.backpage.com and Internet Website 1. In the Paxful employee's conversation with the individual, the individual stated, "I actually had an integration with Paxful going and was sending a bunch of people your way," however, the individual complained about Paxful's bitcoin mining fees. In his transmittal email to the other Paxful employees, the Paxful employee who had engaged in the conversation stated,

"interesting feedback from a guy who is running a escort listing site," and "I already answered him and we will chat it tomorrow."

16.    On or about the dates listed below, employees of Paxful engaged in conversations with individuals they believed to be Paxful customers, but who, in fact, were undercover law enforcement agents located within the Eastern District of California, about using Paxful in connection with www.backpage.com, Internet Website 1, and commercial sex advertisements:

| Date | Conversation |
| --- | --- |
| October 14, 2016 | An employee of Paxful, Inc. provided advice to an undercover law enforcement agent on how to use bitcoin to post an advertisement on www.backpage.com. |
| November 22, 2016 | An employee of Paxful, Inc. provided advice to an undercover law enforcement agent about how to contact www.backpage.com to discuss advertisements. In or around one week later, the undercover agent created a fake prostitution advertisement and posted it on www.backpage.com using the "Pay With Paxful" widget and bitcoin from a Paxful account. |
| June 8, 2018 | An employee of Paxful, Inc. discussed how to dispute a trade with an undercover law enforcement agent who disclosed that the trade was related to paying for advertisements on Internet Website 1. |

17.    On or about October 7, 2018, Schaback and other Paxful employees created an internal document documenting a discussion about setting up technological integration and communicating with a website similar to www.backpage.com and Internet Website 1, that, in fact, had Backpage in its name.

18.    On or about January 2, 2019, two Paxful employees discussed how the Paxful vendors—those seeking for currency to trade for bitcoin—were upset about the loss of www.backpage.com users, stating, in relevant part:

///

///

///

///

///

///

| Employee A | Dude…the vendors are really crying why we aren't going after the new backpage style businesses and why we aren't marketing to them to use btc as a payment system…like we did with backpage…check out vendor slack when you get a chance. I know we are going all in on bank payments but there merikans are crying and I cant stand to see them cry…LOL |
| Employee A | I did my dirty and contacted [escort website advertising commercial sex] requesting to add [Paxful website] to their 'how to buy bitcoin' page. All they have there is shitty coinbase..lets see what happens |
| Employee E | Problem is pay with Paxful |
| Employee E | Its broken at the moment |
| Employee E | And will be ready in this quarter |
| Employee E | But we actually did contact these escort style businesses but problem was pwp [Pay with Paxful] |
| Employee A | Cool… |

19.    On or about the dates below, Paxful directed and caused the transfer of virtual currency from Paxful to a wallet address associated with Internet Website 1:

| Date | Virtual Currency Transferred |
| --- | --- |
| December 18, 2022 | 0.0034 bitcoin |
| December 20, 2022 | 0.0072 bitcoin |
| December 29, 2022 | 0.003917 bitcoin |

All in violation of Title 18, United States Code, Section 371.

Dated:    October 8, 2025

ERIC GRANT
United States Attorney

By:    _____
MATTHEW THUESEN
Assistant United States Attorney

MARGARET A. MOESER
Chief, Money Laundering and Asset Recovery
Section, Criminal Division
U.S. Department of Justice

_____
KEVIN G. MOSLEY
EMILY COHEN
CAYLEE E. CAMPBELL
Trial Attorneys

<u>**United States v. Paxful Holdings, Inc.**</u>
**Penalties for Information**

<u>**Defendant**</u>
**PAXFUL HOLDINGS, INC.**


<u>**COUNTS 1-3:**</u>

VIOLATION:          18 U.S.C. § 371 – Conspiracy to Commit an Offense

PENALTIES:          A term of organizational probation of up to five years, or a fine of up to
                    $500,000 or twice the gross pecuniary gain or loss resulting from the
                    offense, or both probation and a fine.

SPECIAL ASSESSMENT: $400 (mandatory on each count)