ERIC GRANT
United States Attorney
MATTHEW THUESEN
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

MARGARET A. MOESER
Chief, Money Laundering and Asset Recovery Section
Criminal Division, U.S. Department of Justice
KEVIN G. MOSLEY
EMILY COHEN
CAYLEE CAMPBELL
Trial Attorneys
1400 New York Ave NW
Washington, D.C. 20005
Telephone: (202) 514-1263

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.  2:25-cr-235 JAM |
| Plaintiff, | PLEA AGREEMENT |
| v. | DATE: December 9, 2025<br>TIME: 9:00 a.m.<br>COURT: Hon. John A. Mendez |
| PAXFUL HOLDINGS, INC., | |
| Defendant. | |

## **PLEA AGREEMENT**

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the United States of

America, by and through the United States Attorney's Office for the Eastern District of California and the

Department of Justice, Criminal Division, Money Laundering and Asset Recovery Section (collectively,

the "Offices") and PAXFUL HOLDINGS, INC. (the "Defendant" or "Company"), by and through its

undersigned attorneys, and through its authorized representative, pursuant to authority granted by the Defendant's Board of Directors, hereby submit and enter into this plea agreement (the "Agreement"). PXF GLOBAL CORP. ("PXF Global"), which is not a defendant in this matter, purchased the Defendant's assets outside of the United States pursuant to a December 12, 2024 Asset Purchase Agreement, agrees, pursuant to the authority granted by PXF Global's Board of Directors, to certain terms and obligations of the Agreement as described below.  The terms and conditions of this Agreement are as follows:

**Term of the Defendant's and PXF Global's Obligations Under the Agreement**

1.      Except as otherwise provided in Paragraphs 11 and 12 below in connection with the Defendant's and PXF Global's cooperation obligations, the Defendant's and PXF Global's respective obligations under the Agreement shall be effective for a period beginning on the date on which the Information is filed and ending two years from that date (the "Term").  The Defendant agrees, however, that in the event the Offices determine, in their sole discretion, that the Defendant or PXF Global has knowingly violated any provision of this Agreement or failed to completely perform or fulfill any of their obligations under this Agreement, the Offices, in their sole discretion, may impose an extension or extensions of the Term for up to a total additional time period of one year, without prejudice to the Offices' right to proceed as provided in Paragraphs 29-32 below.  Any extension of the Term extends all terms of this Agreement, including the Compliance Reporting Requirements described in Attachment D, except for the term of probation, which may be extended only with approval from the Court, for an equivalent period.  In the event the Department determines that Defendant and/or PXF Global have ceased operations by restricting all users to withdrawal-only functionality, the obligations set forth in Attachments C, D and F shall be replaced with a letter signed under penalty of perjury in the Eastern District of California by an authorized representative of the Defendant and/or PXF Global indicating that the business has ceased operations except to allow users to withdraw their funds. In the event that, during the Term but after a representation of cessation of business operations, the Defendant and/or PXF Global begin to offer any product or service beyond withdrawal of funds, all obligations set forth in this Agreement and its Attachments will return to effect and apply to the Defendant and/or PXF Global.

**The Defendant's and PXF Global's Agreement**

2.     Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the Defendant agrees to waive its right to grand jury indictment and its right to challenge venue in the United States District Court for the Eastern District of California, and to plead guilty to a three-count criminal Information charging the Defendant with one count of conspiracy to willfully fail to establish, develop, implement, and maintain an effective anti-money laundering ("AML") program as required by the Bank Secrecy Act, in violation of 18 U.S.C. § 371; one count of conspiracy to operate an unlicensed money transmitting business ("MTB"), 18 U.S.C. §§ 1960(a) and 1960(b)(1)(C), in violation of 18 U.S.C. § 371; and one count of conspiracy to violate the Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprise Act (the "Travel Act"), 18 U.S.C. §§ 1952(a)(3) and (a)(3)(A), in violation of 18 U.S.C. § 371.  The Defendant further agrees to persist in that plea through sentencing and, as set forth below, the Defendant and PXF Global agree to cooperate fully with the Offices as set forth in Paragraphs 11 and 12.

3.     The Defendant understands that to be guilty of these offenses, the following essential elements of the offenses must be satisfied:

Count One: Conspiracy to Willfully Fail to Maintain an Effective AML Program

a.     First, there was an agreement between two or more persons to commit a crime as charged in the Information, that is to willfully fail to establish, develop, implement, and maintain an effective AML program as required by the BSA and regulations issued thereunder;

b.     Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

c.     Third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

Count Two: Conspiracy to Operate an Unlicensed MTB

a.     First, there was an agreement between two or more persons to commit a crime as charged in the Information, that is to knowingly conduct, control, manage, supervise, direct, or own all or part of an unlicensed MTB, that is an MTB which affects interstate or foreign commerce in any manner or degree and involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity;

b.      Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

c.      Third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

Count Three: Conspiracy to Violate the Travel Act

a.      First, there was an agreement between two or more persons to commit a crime as charged in the Information, that is to use the mail or any facility in interstate or foreign commerce, with intent to otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity, that is any business enterprise involving prostitution, in violation of the laws of the State in which they are committed or of the United States, and thereafter perform or attempt to perform an act to promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on of any unlawful activity, in violation of 18 U.S.C. § 1952(a)(3);

b.      Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

c.      Third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

4.      The Defendant understands and agrees that this Agreement is between the Offices, the Defendant, and PXF Global and does not bind any other Division or Section of the Department of Justice or any other federal, state, or local prosecuting, administrative, or regulatory authority.  Nevertheless, the Offices will bring this Agreement and the nature and quality of the conduct, cooperation, and remediation of the Defendant and PXF Global, their direct or indirect affiliates, successors, subsidiaries, and joint ventures, to the attention of other prosecuting authorities or other agencies, as well as debarment authorities, if requested by the Defendant or PXF Global.

5.      The Defendant and PXF Global agree that this Agreement will be executed by authorized corporate representatives.  The Defendant and PXF Global further agree that resolutions duly adopted by the Defendant's Board of Directors and PXF Global's Board of Directors, respectively, in the form attached to this Agreement as Attachment B ("Certificate of Corporate Resolutions"), authorize the

Defendant and PXF Global to enter into this Agreement and take all necessary steps to effectuate this Agreement, and that the signatures on this Agreement by the Defendant's and PXF Global's corporate representatives and their counsel are authorized by the Defendant's Board of Directors and PXF Global's Board of Directors, on behalf of the Defendant and PXF Global, respectively.

6.    The Defendant and PXF Global agree that each has the full legal right, power, and authority to enter into and perform all of their obligations under this Agreement.

7.    The Offices enter into this agreement based on the individual facts and circumstances presented by this case and the Defendant, including:

a.    The nature and seriousness of the Defendant's offense conduct, as described in the Statement of Facts, attached as Attachment A ("Statement of Facts"), including the Defendant's conspiring to willfully fail to establish, develop, implement, and maintain an effective AML program relating to its payment platform, which was used to transmit the proceeds of, among other things, fraud schemes, illegal prostitution, hacks by malign state actors, and distribution of child sexual abuse material; conspiring to operate an unlicensed MTB through which Defendant knowingly transmitted funds derived from criminal offenses and funds supporting unlawful activity, including illegal prostitution and fraud schemes; and conspiring to use facilities in interstate and foreign commerce with the intent to facilitate the promotion and carrying on of illegal prostitution offenses in the United States;

b.    The Defendant did not receive voluntary disclosure credit pursuant to the Criminal Division's Corporate Enforcement and Voluntary Self-Disclosure Policy ("CEP"), or pursuant to U.S.S.G. § 8C2.5(g)(1), because it did not voluntarily and timely disclose to the Criminal Division the conduct described in the Statement of Facts;

c.    The Defendant received credit for its cooperation with the Offices' investigation pursuant to U.S.S.G. § 8C2.5(g)(2) because it cooperated with the investigation and demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct; the Defendant also received credit pursuant to the CEP for its cooperation by, among other things: (i) promptly collecting, analyzing, and organizing voluminous information at the request of the Offices, (ii) providing timely updates on facts learned during its internal investigation related to conduct described in the Statements of Facts; and (iii) making detailed factual presentations to the government;

d.      The Defendant provided to the Offices all relevant non-privileged facts known to it, including information about the individuals involved in the conduct described in the Statement of Facts and conduct disclosed to the Offices prior to the Agreement;

e.      The Defendant also received credit pursuant to the CEP because it engaged in extensive and timely remedial measures, including: (i) engaging an external auditor to replace and/or train the compliance department and conduct an exhaustive review of policies in place; (ii) implementing automatic freezing of funds based on transaction monitoring alerts, and adding multiple tools to assist with Know Your Customer ("KYC") and AML policies; (iii) removing all former management involved in the conduct underlying the offenses; (iv) working collaboratively with federal law enforcement to respond to law enforcement requests related to its transactional activity on issues relating to terrorist funding; (v) in furtherance of the Defendant having transitioned operations outside of the United States, restricting all U.S. users to withdrawal-only functionality and disabling accounts opened with or sought to be opened using U.S. identification documents.  Therefore, the Offices determined that a reduction of 25% off the bottom of the applicable Guidelines fine range was appropriate pursuant to the CEP based on the Defendant's cooperation and remediation;

f.      The Defendant and PXF Global have enhanced and have committed to continuing to enhance their compliance programs, including ensuring that their compliance programs satisfy the minimum elements set forth in Attachment C to this Agreement ("Corporate Compliance Program");

g.      The Defendant has no prior criminal history;

h.      The Defendant agreed to resolve a parallel investigation by the Department of the Treasury's Financial Crimes Enforcement Network;

i.      The Defendant and PXF Global have agreed to continue to cooperate with the Offices in any ongoing investigation as described in Paragraphs 11 and 12;

j.      Based on the Defendant's and PXF Global's remediation, including the Defendant's undertakings to cease providing money transmitting services in the United States, the state of PXF Global's compliance program, and the Defendant's and PXF Global's agreement to report to the Offices as set forth in Attachment D to this Agreement ("Compliance Reporting Requirements"), the Offices determined that an independent compliance monitor was unnecessary;

k.    After considering (a) through (j) above, the Offices have determined that the appropriate resolution of this case is a plea to a criminal Information, as described in Paragraph 2, a criminal fine of $112,500,000, which reflects a discount of 25% off the low end of the applicable Sentencing Guidelines fine range, taking into account the Defendant's cooperation and remediation, as well as its prior history, pursuant to the Corporate Enforcement and Voluntary Self-Disclosure Policy;

l.    The Defendant met its burden of establishing an inability to pay the criminal penalty sought by the Offices, despite agreeing that the proposed criminal fine was otherwise appropriate based on the law and the facts.  The Offices, with the assistance of an expert in corporate financial affairs, conducted an independent ability to pay analysis, considering a range of factors outlined in the Justice Department's Inability to Pay Guidance (*see* October 8, 2019 Memorandum from Assistant Attorney General Brian Benczkowski to All Criminal Division Personnel re: Evaluating a Business Organization's Inability to Pay a Criminal Fine or Criminal Monetary Penalty), including but not limited to: (i) the factors outlined in 18 U.S.C. § 3572 and U.S.S.G. § 8C3.3(b); (ii) the Defendant's current financial condition; and (iii) the Defendant's alternative sources of capital.  Based on that independent analysis, the Offices determined that paying a total criminal penalty greater than $4,000,000 would substantially threaten the continued viability of the Defendant; and

m.    Accordingly, after considering (a) through (l) above, the Offices have determined that the appropriate resolution in this case is a guilty plea to a three-count Information, as described in Paragraph 2, and a total criminal penalty of $4,000,000.

8.    The Defendant and PXF Global agree to abide by all terms and obligations of this Agreement as described herein, including, but not limited to, the following:

a.    The Defendant agrees to plead guilty as set forth in this Agreement;

b.    to abide by all sentencing stipulations contained in this Agreement;

c.    to appear, through its duly appointed representatives, as ordered for all court appearances, and obey any other ongoing court order in this matter, consistent with all applicable U.S. and foreign laws, procedures, and regulations;

d.    to commit no further crimes;

e.    to be truthful at all times with the Court;

f.      to pay the applicable fine and special assessment;

g.      to cooperate fully with the Offices as described in Paragraphs 11 and 12; and

h.      to continue to remediate and enhance their AML compliance programs as described in Paragraph 9, including but not be limited to the minimum elements set forth in Attachment C of this Agreement; and

i.      to report to the Offices annually during the Term regarding remediation and implementation of the compliance measures described in Attachment C, prepared in accordance with Attachment D to this Agreement.

9.      The Defendant and PXF Global represent that they have implemented and will continue to implement compliance programs that meet, at a minimum, the elements set for in Attachment C.  To the extent the Defendant or PXF Global begin operating in the United States or doing business with U.S.-based customers, such programs shall be designed to detect and prevent violations of applicable money laundering, money transmitting, and other applicable AML laws throughout their operations, including those of their affiliates, agents, and joint ventures.  Thirty (30) days prior to the expiration of the Term, the Defendant, by its duly authorized representative, and PXF Global, by its duly authorized representative, will certify to the Offices, in the form of executing the document attached as Attachment F to this Agreement, that the Defendant and PXF Global have met their compliance obligations pursuant to this Agreement.  Each certification will be deemed a material statement and representation to the executive branch of the United States for purposes of 18 U.S.C. §§ 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

10.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Defendant and PXF Global agree that in the event that, during the Term, the Defendant or PXF Global undertake any change in corporate form, including if they sell, merge, or transfer business operations that are material to the Defendant's or PXF Global's operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, they shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations

described in this Agreement. The purchaser or successor in interest must also agree in writing that the Offices' ability to determine a breach under this Agreement is applicable in full force to that entity. The Defendant and PXF Global agree that the failure to include these provisions in the transaction will make any such transaction null and void. The Defendant and PXF Global shall provide notice to the Offices at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Offices shall notify the Defendant and PXF Global prior to such transaction (or series of transactions) if they determine that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. If at any time during the Term the Defendant or PXF Global engage in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Offices may deem it a breach of this Agreement pursuant to Paragraphs 29-32. Nothing herein shall restrict the Defendant and PXF Global from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Offices.

11.    The Defendant and PXF Global shall cooperate fully with the Offices in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and any individual or entity referred to therein, as well as any other conduct under investigation by the Offices at any time during the Term, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term. At the request of the Offices, the Defendant and PXF Global shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of the Defendant, PXF Global, their parent company or their affiliates, or any of their present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and other conduct under investigation by the Offices or any other component of the Department of Justice at any time during the Term. The Defendant's and PXF Global's cooperation pursuant to this Paragraph is subject to applicable laws and regulations, including bank secrecy and data privacy, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Defendant and PXF Global

must provide to the Offices a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Defendant and PXF Global bear the burden of establishing the validity of any such assertion.  The Defendant and PXF Global agree that their cooperation pursuant to this Paragraph shall include, but not be limited to, the following:

a.      The Defendant represents that it has timely and truthfully disclosed all relevant factual information about which the Defendant and has any knowledge with respect to the Defendant's activities, those of the its subsidiaries and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, relating to the conduct described in this Agreement, the Information, and the attached Statement of Facts, as well as other conduct known by the Defendant to be under investigation by the Offices at any time about which the Defendant has any knowledge.  The Defendant and PXF Global further agree that they shall promptly and truthfully disclose all factual information with respect to their activities, those of their affiliates, and those and those of their present and former directors, officers, employees, agents, and consultants related to the conduct described in this Agreement or the Statement of Facts about which the Defendant and/or PXF Global shall gain any knowledge or about which the Offices have inquired or may inquire.  This obligation of truthful disclosure includes, but is not limited to, the obligation of the Defendant and PXF Global to provide to the Offices, upon request, any document, record, or other tangible evidence about which the Offices may inquire of the Defendant and PXF Global, including evidence that is responsive to any requests made prior to the execution of this Agreement.

b.      Upon request of the Offices, the Defendant and PXF Global shall designate knowledgeable employees, agents, or attorneys to provide to the Offices the information and materials described in Paragraph 11(a) above on behalf of the Defendant and PXF Global.  It is further understood that the Defendant and PXF Global must at all times provide complete, truthful, and accurate information.

c.      The Defendant and PXF Global shall use their best efforts to make available for interviews or testimony, as requested by the Offices, present or former officers, directors, employees, agents, and consultants of the Defendant and PXF Global.  This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities.  Cooperation under this Paragraph shall include

identification of witnesses who, to the knowledge of the Defendant and PXF Global, may have material information regarding the matters under investigation.

d.    With respect to any information, testimony, documents, records or other tangible evidence provided to the Offices pursuant to this Agreement, the Defendant and PXF Global consent to any and all disclosures to other governmental authorities including United States authorities and those of a foreign government of such materials as the Offices, in their sole discretion, shall deem appropriate.

e.    The Defendant, having ended operations in the United States and no longer providing financial services to customers based in the United States, agrees to immediately report to the Offices any decisions by the Defendant to re-enter the United States market during the Term prior to the implementation of such decision and to certify that their compliance program satisfies the minimum elements of Attachment C to this Agreement and is fully compliant with U.S. law before re-entering the United States market.  PXF Global, which purchased Defendant's assets outside of the United States, agrees to report any decision, prior to the implementation of such decision, by PXF Global to begin operating in the United States or serving customers based in the United States during the Term.

12.    In addition to the cooperation obligations provided for in Paragraph 11 of the Agreement, during the Term, should the Defendant or PXF Global learn of any evidence or allegation of conduct that may a criminal violation of U.S. federal law, the Defendant and PXF Global shall promptly report such evidence or allegation to the Offices.  Thirty (30) days prior to the end of the Term, the Defendant and PXF Global, by their duly authorized representatives, will certify to the Offices in the form of executing the document attached as Attachment E to this Agreement that the Defendant and PXF Global have met their disclosure obligations pursuant to this Paragraph.  Each certification will be deemed a material statement and representation by the Defendant and PXF Global to the executive branch of the United States for purposes of 18 U.S.C. §§ 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

13.    The Defendant agrees that any fine imposed by the Court and the mandatory special assessment of $400 per count of conviction will be due and payable as specified in Paragraph 26 below, and that any restitution imposed by the Court will be due and payable in accordance with the Court's order.

**The United States' Agreement**

14.     In exchange for the guilty plea of the Defendant, and the complete fulfillment of all of its obligations under this Agreement, the Offices agree they will not file additional criminal charges against the Defendant or any of its direct or indirect affiliates, parent companies, subsidiaries, or joint ventures relating to any of the conduct described in the Statement of Facts or the Information filed pursuant to this agreement.  This Agreement does not provide any protection against, and the Offices may use any information related to the conduct described in the Statement of Facts against Defendant or PXF Global in, any prosecution or other proceeding relating to (a) obstruction of justice; (b) perjury or making a false statement; (c) any crime of violence or terrorism-related offense; or (d) a violation of any provision of Title 26 of the United States Code.  This Agreement does not provide any protection against prosecution for any future conduct by the Defendant or PXF Global or any of their direct or indirect affiliates, subsidiaries, officers, directors, employees, agents, or consultants, whether or not disclosed by the Defendant or PXF Global pursuant to the terms of this Agreement.  In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Defendant.  The Defendant and PXF Global agree that nothing in this Agreement is intended to release the Defendant and PXF Global from any and all of the Defendant's and PXF Global's tax liabilities and reporting obligations for any and all income not properly reported and/or legally or illegally obtained or derived.

**Factual Basis**

15.     The Defendant is pleading guilty because it is guilty of the charges contained in the Information.  The Defendant and PXF Global admit, agree, and stipulate that the factual allegations set forth in the Information and Statement of Facts are true and correct, that the Defendant is responsible for the acts of its officers, directors, employees, and agents described in the Information and Statement of Facts, and that the Information and Statement of Facts accurately reflect the Defendant's criminal conduct. The Defendant and PXF Global stipulate to the admissibility of the Statement of Facts in any proceeding by the Offices, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the Statement of Facts at any such proceeding.

**The Defendant's Waiver of Rights, Including the Right to Appeal**

16.     Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit the admissibility of statements made in the course of plea proceedings or plea discussions in both civil and criminal proceedings, if the guilty plea is later withdrawn.  The Defendant and PXF Global expressly warrant that they have discussed these rules with their counsel and understand them.  Solely to the extent set forth below, the Defendant and PXF Global voluntarily waive and give up the rights enumerated in Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410.  The Defendant and PXF Global agree that, effective as of the date the Defendant signs this Agreement, the Defendant and PXF Global will not dispute the Statement of Facts set forth in Attachment A, and that the Statement of Facts shall be admissible against the Defendant, or  PXF Global, in any criminal case involving the Offices and the Defendant and PXF Global, as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing.  In addition, the Defendant and PXF Global also agree not to assert any claim under the Federal Rules of Evidence (including Rule 410 of the Federal Rules of Evidence), the Federal Rules of Criminal Procedure (including Rule 11 of the Federal Rules of Criminal Procedure), or the United States Sentencing Guidelines (including U.S.S.G. § 1B1.1(a)) that the Statement of Facts should be suppressed or is otherwise inadmissible as evidence (in any form).  Specifically, the Defendant understands and agrees that any statements that it makes in the course of its guilty plea or in connection with the Agreement are admissible against the Defendant, or PXF Global, for any purpose in any U.S. federal criminal proceeding if, even though the Offices have fulfilled all of their obligations under this Agreement and the Court has accepted the guilty plea, the Defendant nevertheless withdraws its guilty plea.

17.     The Defendant and PXF Global are satisfied that the Defendant's and PXF Global's attorneys have rendered effective assistance.  The Defendant and PXF Global understand that by entering into this agreement, the Defendant and PXF Global surrender certain rights as provided in this agreement.

18.     The Defendant understands that, by pleading guilty, it is waiving the following constitutional rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to pursue any

affirmative defenses, Fourth Amendment or Fifth Amendment claims, constitutional challenges to the statutes of conviction, and other pretrial motions that have been filed or could be filed; (e) to subpoena witnesses to testify on the Defendant's behalf; and (f) to confront and cross-examine witnesses against the Defendant.

19.    The Defendant understands the law gives it a right to appeal the Defendant's guilty pleas, convictions, and sentence. The Defendant agrees as part of the Defendant's pleas, however, to give up the right to appeal the guilty pleas, convictions, and the sentence imposed in this case as long as the sentence does not exceed the statutory maximum penalties for the offenses to which the Defendant is pleading guilty. The Defendant understands this waiver includes, but is not limited to, any and all constitutional and/or legal challenges to the Defendant's convictions and guilty pleas, including arguments that the statutes to which the Defendant is pleading guilty are unconstitutional, and any and all claims that the Statement of Facts is insufficient to support the Defendant's guilty pleas. The Defendant specifically gives up the right to appeal any fine, order of restitution, or probation.

20.    Notwithstanding the Defendant's waiver of appeal, it will retain the right to appeal if one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the statutory maximum; and/or (2) the government appeals the sentence in the case. The Defendant understands these circumstances occur infrequently and in almost all cases this agreement constitutes a complete waiver of all appellate rights.

21.    In addition, regardless of the sentence the Defendant receives, the Defendant and PXF Global also give up any right to bring a collateral attack, including a motion under 28 U.S.C. §§ 2255 or 2241, challenging any aspect of the guilty pleas, convictions, or sentence, except for non-waivable claims.

22.    This Agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b). The Defendant and PXF Global hereby waive all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a. The Defendant and PXF Global waive all defenses based on the statute of limitations and venue with respect to any prosecution related to the conduct described in the Statement of Facts or the

Information, including any prosecution that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction is later vacated for any reason; (b) the Defendant or PXF Global violate this Agreement; or (c) the plea is later withdrawn, provided such prosecution is brought within one year of any such vacation of conviction, violation of the Agreement, or withdrawal of plea plus the remaining time period of the statute of limitations as of the date that this Agreement is signed. The Defendant and PXF Global further waive the right to raise on appeal or on collateral review any argument that the admitted conduct does not fall within the scope of the statutes of conviction. The Offices are free to take any position on appeal or any other post-judgment matter. The parties agree that any challenge to the Defendant's sentence that is not foreclosed by this Paragraph will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the Defendant or PXF Global from raising a claim of ineffective assistance of counsel in an appropriate forum.

### **Penalty and Sentencing Recommendation**

23.    The statutory maximum sentence that the Court can impose for a conspiracy to willfully fail to establish, develop, implement, and maintain an effective AML program as required by the Bank Secrecy Act, 31 U.S.C. §§ 5318(h), 5322(c), 5322(e), is: a fine of up to $500,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest (18 U.S.C. §§ 3571(c)(3) and (d)), five years' probation (18 U.S.C § 3561(c)(1)); and a mandatory special assessment of $400 (18 U.S.C. § 3013(a)(2)(B)). The statutory maximum sentence that the Court can impose for a conspiracy to operate an unlicensed MTB, is a fine of up to $500,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest (18 U.S.C. §§ 3571(c)(3) and (d)), five years' probation (18 U.S.C § 3561(c)(1)); and a mandatory special assessment of $400 (18 U.S.C. § 3013(a)(2)(B)). The statutory maximum sentence that the Court can impose for a conspiracy to violate the Travel Act, is: a fine of up to $500,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest (18 U.S.C. §§ 3571(c)(3) and (d)), five years' probation (18 U.S.C § 3561(c)(1)); and a mandatory special assessment of $400 (18 U.S.C. § 3013(a)(2)(B)). The parties further agree that the Defendant profited by an amount of at least $29,742,920 from the offense set

forth in Count Two (conspiracy to operate an unlicensed MTB) and profited in the amount of at least $2,750,769 from the offense set forth in Count Three (conspiracy to violate the Travel Act).

24.     The parties agree that pursuant to *United States v. Booker*, 543 U.S. 22 (2005), the Court must determine an advisory sentencing guideline range pursuant to the United States Sentencing Guidelines.  The Court will then determine a reasonable sentence within the statutory range after considering the advisory sentencing guideline range and the factors listed in 18 U.S.C. § 3553(a).  The parties' agreement herein to any guideline sentencing factors constitutes proof of those factors sufficient to satisfy the applicable burden of proof.  The Defendant also understands that if the Court accepts this Agreement, the Court is bound by the sentencing provisions in Paragraph 26.

25.     The Offices and the Defendant agree that a faithful application of the Sentencing Guidelines to determine the applicable fine range yields the following analysis:

      a.     <u>Count One – Conspiracy to Violate 31 U.S.C. §§ 5318 and 5322</u>

            Offense level: 12, pursuant to U.S.S.G. § 2X1.1(a), calculated as follows:

                  Base offense level for the underlying offense: 8, pursuant to U.S.S.G. § 2S1.3(a)(2).

                  Specific offense characteristics:

                      2 levels are added, pursuant to U.S.S.G. § 2S1.3(b)(1)(A), because the Defendant knew the funds were proceeds of unlawful activity.

                      2 levels are added, pursuant to U.S.S.G. § 2S1.3(b)(2), because the Defendant was convicted of an offense under subchapter II of chapter 53 of title 31, United States Code, and committed the offense as part of a pattern of unlawful activity involving more than $100,000 in a 12-month period.

      b.     <u>Count Two – Conspiracy to Violate 18 U.S.C. § 1960(b)(1)(C)</u>

            Offense level: 38, pursuant to U.S.S.G. § 2X1.1(a), calculated as follows:

                  Offense level for the underlying offense: 38, pursuant to U.S.S.G. § 2S1.1(a)(2), with reference to U.S.S.G. § 2B1.1(b)(1)(P).

      c.     <u>Count Three – Conspiracy to Violate 18 U.S.C § 1952</u>

Offense level: 19, pursuant to U.S.S.G. § 2X1.1(a), calculated as follows:

    Offense level for the underlying offense: 19, pursuant to U.S.S.G.

    § 2E1.2(a)(1).

d.    <u>Multiple Counts</u>

Counts One and Two will group under U.S.S.G. § 3D1.2, resulting in a group offense level of 38, pursuant to U.S.S.G. § 3D1.3.

Combined offense level: 38, pursuant to U.S.S.G. § 3D1.4, because the offense level for Counts Three is 9 or more levels less than the group offense level for Counts One and Two.

e.    <u>Chapter 8, Part C Offense Level</u>: Pursuant to U.S.S.G. § 8C2.3, the offense level is 38.

f.    <u>Base Fine</u>:  Pursuant to U.S.S.G. § 8C2.4(a), the base fine is $150,000,000.

g.    <u>Culpability Score</u>:  Pursuant to U.S.S.G § 8C2.5, the culpability score is 5, calculated as follows:

| | | |
|---|---|---:|
| i. | Base culpability score | 5 |
| ii. | the organization had 50 or more employees and individuals within substantial authority personnel participated in the offense | +2 |
| iii. | the organization cooperated in the investigation and accepted responsibility for its criminal conduct | **-2** |
| | **TOTAL** | **5** |

h.    <u>Calculation of Fine Range</u>

| | |
|---|---|
| Base Fine | $150,000,000 |
| Multipliers | 1 (min) − 2 (max) |
| Fine Range | $150,000,000 (min) - $300,000,000 (max) |

26.    Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the Offices and the Defendant agree that the following represents the appropriate sentence in this case:

a.    <u>Disposition</u>:  Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Offices and the Defendant agree that the appropriate disposition of this case is as set forth above, and agree to recommend jointly that the Court at a hearing to be scheduled at an agreed upon time impose a sentence requiring the Defendant to pay a criminal fine, as set forth below.

b.    <u>Criminal Fine</u>: The parties agree, based on the application of the Sentencing Guidelines, that the appropriate total criminal fine is $112,500,000.  This reflects a 25% discount off the low end of the sentencing Guidelines Fine Range ($150,000,000).  The Defendant has made representations, and provided supporting evidence, that the Defendant has an inability to pay a $112,500,000 criminal penalty.  Based on those representations, and an independent analysis verifying the accuracy of those representations conducted by the Offices, the parties agree that a criminal penalty of $4,000,000 (the "Total Criminal Fine") is appropriate.  Nothing in this Agreement shall be deemed an agreement by the Offices that $4,000,000 is the maximum penalty that may be imposed in any future prosecution, and the Offices are not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Offices agree that under those circumstances, they will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment. Payments towards the fine shall be by cashier's check or certified check made payable to the Clerk of the Court.

c.    <u>Timing of Payment of Total Criminal Fine</u>: The Defendant agrees to pay $2,000,000, equal to 50% of the Total Criminal Fine, no later than seven (7) business days after entry of the judgment by the Court.  The Defendant shall pay an additional $2,000,000, equal to the remaining 50% of the Total Criminal Fine, no later than ninety (90) business days after entry of the judgment by the Court.  Payment may be made by PXF Global or its affiliates in satisfaction of the Total Criminal Fine.

d.    <u>Mandatory Special Assessment</u>:  The Defendant agrees to pay a special assessment of $400 per count within ten (10) business days of the date of sentencing by delivering a check or money order payable to the United States District Court to the United States Probation Office .  The Defendant understands that this Agreement is voidable at the option of the Offices if it fails to pay the assessment prior to the sentencing hearing.

e.    <u>Probation</u>:    The Offices and the Defendant agree that a term of organizational probation for a period of two years shall be imposed on the Defendant pursuant to 18 U.S.C. §§ 3551(c)(1) and 3561(c)(1).  The parties agree, pursuant to U.S.S.G. § 8D1.4, that the term of probation shall include as conditions the obligations set forth in Paragraphs 8 through 13 above.

27.    This Agreement is presented to the Court pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C).  The Defendant understands that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise the Defendant's counsel that the Court is not required to follow the Agreement and afford the Defendant the opportunity to withdraw its plea; and (c) advise the Defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the Defendant than the Agreement contemplated.  The Defendant further understands that if the Court refuses to accept any provision of this Agreement, neither party shall be bound by the provisions of the Agreement.

28.    The Defendant and the Offices waive the preparation of a Pre-Sentence Investigation Report ("PSR") and intend to seek a sentencing by the Court immediately following the Rule 11 hearing in the absence of a PSR.  Pursuant to Rule 32(c)(1)(A)(ii), the Defendant and the Offices submit that the information in the record of this case, including the considerations set forth in Paragraph 7 of this Agreement and the detailed Statement of Facts to which the Defendant admits, enables the Court to meaningfully exercise its sentencing authority under 18 U.S.C. § 3553. The Defendant understands that the decision whether to proceed with the sentencing proceeding without a PSR is exclusively that of the Court.  In the event the Court directs the preparation of a PSR, the Offices will fully inform the preparer of the PSR and the Court of the facts and law related to the Defendant's case.

**Breach of Agreement**

29.    If, during the Term, (a) the Defendant or PXF Global commits any felony under U.S. federal law; (b) the Defendant or PXF Global provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) the Defendant or PXF Global fails to cooperate as set forth in Paragraphs 11 and 12 of this Agreement; (d) the Defendant or PXF Global fails to implement a compliance program and report to the Department as set forth in Paragraphs 9 and 10 of this Agreement and Attachments C and D; (e) the Defendant or PXF Global commits any acts that, had they occurred

within the jurisdictional reach of the United States, would be a violation of federal money laundering laws; or (f) the Defendant or PXF Global otherwise fails specifically to perform or to fulfill completely each of the Defendant's and PXF Global's obligations under the Agreement, regardless of whether the Offices become aware of such a breach after the Term, the Defendant and PXF Global shall thereafter be subject to prosecution for any federal criminal violation of which the Offices have knowledge, including, but not limited to, additional charges and/or civil forfeiture actions arising out of the conduct described in the Statement of Facts, distinct from the charges in the Information described in Paragraph 2, as well as charges related to any additional conduct, if appropriate. Such charges may be pursued by the Offices in the U.S. District Court for the Eastern District of California or any other appropriate venue. Determination of whether the Defendant or PXF Global has breached the Agreement and whether to pursue prosecution of the Defendant or PXF Global and/or a civil forfeiture action shall be in the Office's sole discretion. Any such prosecution and/or civil forfeiture action may be premised on information provided by the Defendant, PXF Global, their subsidiaries or affiliates, or the personnel of any of the foregoing. Any such prosecution and/or civil forfeiture action relating to the conduct described in the Statement of Facts or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Defendant, PXF Global, and their subsidiaries and affiliates notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Defendant and PXF Global agree that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year. The Defendant and PXF Global give up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement. In addition, the Defendant and PXF Global agree that the statute of limitations as to any violation of federal law that occurs during the term of the cooperation obligations provided for in Paragraphs 11 and 12 of the Agreement will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Offices are made aware of the violation or the duration of the

term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

30.     In the event the Offices determine that the Defendant or PXF Global has breached this Agreement, the Offices agree to provide the Defendant and PXF Global with written notice of such breach prior to instituting any prosecution resulting from such breach.  Within thirty (30) days of receipt of such notice, the Defendant and PXF Global shall have the opportunity to respond to the Offices in writing to explain the nature and circumstances of such breach, as well as the actions the Defendant and PXF Global have taken to address and remediate the situation, which explanation the Offices shall consider in determining next steps pursuant to Paragraph 31.

31.     In the event that the Offices determine that the Defendant or PXF Global has breached this agreement: (a) all statements made by or on behalf of the Defendant, PXF Global, and their subsidiaries and affiliates to the Offices or to the Court, including the Statement of Facts, and any testimony given by the Defendant or  PXF Global before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings and civil forfeiture proceedings brought by the Offices against the Defendant, PXF Global, and their subsidiaries and affiliates; and (b) the Defendant and PXF Global shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Defendant or PXF Global prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible.  The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Defendant or PXF Global, will be imputed to the Defendant or PXF Global for the purpose of determining whether the Defendant or PXF Global have violated any provision of this Agreement shall be in the sole discretion of the Offices.

32.     The Defendant and PXF Global acknowledge that the Offices have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Defendant or PXF Global breaches this Agreement and is subsequently prosecuted for any crime, or if the breach constitutes a violation of the Defendant's probation.  The Defendant and PXF Global further

acknowledge that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion

**Public Statements by the Defendant**

33.     The Defendant and PXF Global expressly agree that they shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Defendant or PXF Global make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Defendant set forth above or the facts described in the Information and the Statement of Facts.  Any such contradictory statement shall, subject to cure rights of the Defendant and PXF Global described below, constitute a breach of this Agreement, and the Defendant and PXF Global thereafter shall be subject to prosecution as set forth in Paragraphs 29-32 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the Information or the Statement of Facts will be imputed to the Defendant and PXF Global for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Offices.  If the Offices determine that a public statement by any such person contradicts in whole or in part a statement contained in the Information or the Statement of Facts, the Offices shall so notify the Defendant and PXF Global, and the Defendant and PXF Global may avoid a breach of this Agreement by publicly repudiating such statement(s) within five (5) business days after notification.  The Defendant and PXF Global shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Information and the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Information or the Statement of Facts.  This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Defendant or PXF Global in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Defendant or PXF Global.

34.     The Defendant and PXF Global agree that if they or any of their direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Defendant and PXF Global shall first consult the Offices to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters

between the Offices and the Defendant; and (b) whether the Offices have any objection to the release or statement.

## Complete Agreement

35.     This document, including the attachments, states the full extent of the Agreement between the parties.  There are no other promises or agreements, express or implied.  Any modification of this Agreement shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all parties.

## APPROVALS AND SIGNATURES

**A.     Defense Counsel:**

I have read this plea agreement and have discussed it fully with my clients, Paxful Holdings Inc. and PXF Global Corp.  The plea agreement accurately and completely sets forth the entirety of the agreement.  I concur in my client's decision to plead guilty as set forth in this plea agreement.

Dated:   10/16/2025

*Eugene Ingoglia*
_____
EUGENE INGOLIA
Attorney for Paxful Holdings Inc. and PXF Global Corp.

**B.     Defendant's and PXF Global's Authorized Representatives:**

PAXFUL HOLDINGS, INC. and PXF Global, through their authorized representatives, affirm that this document contains all of the agreements made between PAXFUL HOLDINGS, INC., and  PXF Global—with the assistance of counsel—and the Offices regarding these pleas.  There are no other promises, assurances, or agreements the Offices have made or entered into with PAXFUL HOLDINGS, INC., or PXF Global, that have affected PAXFUL HOLDINGS, INC.'s decision to enter any plea of guilty or to enter into this Agreement.  If there are any additional promises, assurances, or agreements, PAXFUL HOLDINGS, INC., PXF Global, and the Offices will jointly inform the Court in writing before PAXFUL HOLDINGS, INC. enters its guilty plea.

PAXFUL HOLDINGS, INC., and  PXF Global, understand that no one, including counsel for PAXFUL HOLDINGS, INC. or PXF Global, can guarantee the outcome of this case or what sentence the

Court may impose if PAXFUL HOLDINGS, INC. pleads guilty.  If anyone, including PAXFUL HOLDINGS, INC.'s and PXF Global's counsel, has done or said anything other than what is contained in this Agreement, PAXFUL HOLDINGS, INC. will inform the Court when it stands before the Court to enter its pleas.

As PAXFUL HOLDINGS, INC.'s and PXF Global's authorized representative, I understand the Court will ask me under oath to answer questions about the offenses to which PAXFUL HOLDINGS, INC. is pleading guilty and PAXFUL HOLDINGS, INC.'s, and PXF Global's, understanding of this plea agreement.  I understand that I may be prosecuted if I make knowingly false statements or give false answers and may suffer other consequences set forth in this agreement.

On behalf of PAXFUL HOLDINGS, INC., and PXF Global, I have read this plea agreement carefully and understand it thoroughly.  I know of no reason why the Court should find me incompetent to enter into this Agreement on behalf of PAXFUL HOLDINGS, INC., and PXF Global, or to enter the pleas on behalf of PAXFUL HOLDINGS, INC.  I enter into this Agreement knowingly and voluntarily. I understand that anything that I discuss with PAXFUL HOLDINGS, INC.'s and PXF Global's counsel is privileged and confidential and cannot be revealed without PAXFUL HOLDINGS, INC.'s and PXF Global's permission.  Knowing this, I agree that this document will be filed with the Court.

PAXFUL HOLDINGS, INC. and, where applicable, PXF Global, is fully satisfied with the representation given PAXFUL HOLDINGS, INC. and PXF Global, by the counsel for PAXFUL HOLDINGS, INC. and PXF Global, and I am prepared to repeat this statement at the time I stand before the Court and enter PAXFUL HOLDINGS, INC.'s guilty pleas.  PAXFUL HOLDINGS, INC.'s counsel and PAXFUL HOLDINGS, INC. have discussed all possible defenses to the charges to which PAXFUL HOLDINGS, INC. is pleading guilty.  PAXFUL HOLDINGS, INC.'s counsel has investigated PAXFUL HOLDINGS, INC.'s case and followed up on any information and issues PAXFUL HOLDINGS, INC. has raised to PAXFUL HOLDINGS, INC.'s and, as applicable, PXF Global's, satisfaction.  PAXFUL HOLDINGS, INC.'s counsel has taken the time to fully explain the legal and factual issues involved in this case to PAXFUL HOLDINGS, INC.'s and, as applicable, PXF Global's, satisfaction.  PAXFUL HOLDINGS, INC.'s counsel and PAXFUL HOLDINGS, INC. have discussed the statutes applicable to PAXFUL HOLDINGS, INC.'s offenses and sentence, as well as the possible effect the U.S.S.G. may have

on PAXFUL HOLDINGS, INC.'s sentence.

Based on PAXFUL HOLDINGS, INC.'s, and, as applicable, PXF Global's, complete understanding of this plea agreement, PAXFUL HOLDINGS, INC. therefore wishes to enter a plea of guilty to Counts One, Two, and Three of the Information filed in this case.

Dated: **October 16th, 2025**

_____
PAXFUL HOLDINGS, INC.
Defendant

Dated: **October 16th, 2025**

_____
PXF GLOBAL CORP.

C.     **Attorneys for United States:**

I accept and agree to this plea agreement on behalf of the government.

Dated:  10/21/2025                                    ERIC GRANT
                                                      United States Attorney


                                                      MATTHEW THUESEN
                                                      Assistant United States Attorney



                                                      MARGARET A. MOESER
                                                      Chief, Money Laundering and Asset Recovery
                                                      Section, Criminal Division
                                                      U.S. Department of Justice


                                                      KEVIN G. MOSLEY
                                                      EMILY COHEN
                                                      CAYLEE E. CAMPBELL
                                                      Trial Attorneys

**ATTACHMENT A**

**Statement Of Facts**

The following Statement of Facts is incorporated by reference as part of the Plea Agreement between the Department of Justice, Criminal Division, Money Laundering and Asset Recovery Section ("MLARS"), and the United States Attorney's Office for the Eastern District of California (the "USAO-EDCA") (collectively, the "Offices"), and PAXFUL HOLDINGS, INC. (the "Defendant") and PXF Global Corp ("PXF Global"). The Defendant and PXF Global hereby agree and stipulate that the following facts are true and accurate. Certain of the facts herein are based on information obtained from third parties by the United States through its investigation and described to the Defendant.

The Defendant admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Had this matter proceeded to trial, the Defendant acknowledges that the United States would have proven beyond a reasonable doubt by admissible evidence the facts alleged below and set forth in the Criminal Information.

**Overview**

Paxful, Inc., was a Delaware corporation, which had its principal place of business in New York. Paxful, Inc., was established by its co-founders, Mohamed Azab Youssef and Artur Schaback, on July 17, 2015. Youssef was Paxful, Inc.'s Chief Executive Officer and Schaback was, at various times, the Chief Technology Officer, Chief Operating Officer, and Chief Product Officer. Youssef and Schaback were Paxful, Inc.'s directors and sole board members and controlled the corporation.

At all times, Paxful, Inc., knowingly operated as a money services business ("MSB"), as well as a money transmitting business ("MTB") that engaged in the transfer of virtual currency on

behalf of its customers, including in the Eastern District of California. Through Youssef, Schaback, and others, Paxful, Inc., operated an online virtual currency trading platform known as "Paxful," where its customers traded virtual currency for other items, including fiat currency, pre-paid cards, and gift cards. To facilitate its transmitting business, Paxful, Inc., maintained an escrow wallet to hold customers' virtual currency while a trade was pending. In March 2016, Paxful, Inc., contracted with a digital asset trust company to serve as the custodian of the escrow wallet but kept control over the release of virtual currency from the wallet by controlling the wallet's private key. Once Paxful customers confirmed a trade, Paxful, Inc., directed the transfer of virtual currency from the escrow wallet to the appropriate customer's account. Paxful, Inc., also permitted its customers to transfer virtual currency internally between Paxful accounts and externally to accounts outside of the platform. Paxful, Inc., charged and collected certain fees for each of its virtual currency transfer services.

On June 5, 2019, Youssef and Schaback established the parent corporation Paxful Holdings, Inc., in Delaware. Youssef and Schaback were Paxful Holdings, Inc.'s directors and sole board members and controlled the parent corporation. Paxful Holdings, Inc., continued to facilitate the Paxful platform.

In connection with the Paxful platform, as operated by Paxful, Inc., and, later, Paxful Holdings, Inc. (hereinafter collectively referred to as the Defendant or Paxful), the Defendant conspired to willfully fail to establish, develop, implement, and maintain an effective anti-money laundering ("AML") program, resulting in the platform being used to transfer the proceeds of, among other things, fraud schemes, illegal prostitution, hacks by malign state actors, and distribution of child sexual abuse material; conspired to operate an unlicensed MTB through which the Defendant knowingly transmitted funds derived from criminal offenses and funds supporting

unlawful activity, including illegal prostitution and fraud schemes; and conspired to use facilities in interstate and foreign commerce with the intent to facilitate the promotion and carrying on of illegal prostitution offenses in the United States.

From January 1, 2017, to September 2, 2019, the Defendant facilitated more than 26.7 million trades, aggregating nearly $3 billion in value, and collected more than $29.7 million in revenue. The Defendant obtained proceeds of its unlicensed MTB activity in the amount of at least $29,742,920.

The Defendant knew at all times that it was required to comply with the Bank Secrecy Act ("BSA"), including by establishing, developing, implementing, and maintaining an effective AML program. An effective AML program protects the U.S. financial system, U.S. consumers, and U.S. financial institutions from money laundering and terrorist financing. The Defendant knew that an effective AML program required policies, procedures, and internal controls, such as know your customer ("KYC") policies, independent compliance testing, AML training, and monitoring and reporting procedures for suspicious activity.

From July 2015 through at least November 2019, the Defendant and others, including Youssef and Schaback, willfully failed to establish, develop, implement, and maintain an effective AML program at the Defendant as a pattern of illegal activity involving more than $100,000 in a 12-month period.

For example, at various periods between July 2015 and at least November 2019, the Defendant, through Youssef, Schaback, and others:

- Allowed customers to open Paxful accounts and trade without providing sufficient identifying information or documents to allow the Defendant to know the true identities of its customers;

- Marketed Paxful to customers as a platform that did not require KYC and/or that allowed "buying without ID";

- Facilitated the transfer of funds between customers without conducting KYC, despite knowing the Defendant was required to do so, claiming the Defendant outsourced KYC procedures to Paxful vendors, who were responsible for KYC and "following MSB guidelines," or claiming "all the KYC is left to our vendors on a per trade basis";

- Failed to implement effective AML and KYC policies and procedures to monitor customer transactions for suspicious activity;

- Presented fake AML and KYC policies to financial institutions that they knew were not, in fact, implemented or enforced at Paxful, Inc.;

- Made exceptions to AML and KYC policies based on Paxful customers' volume and amount of trading and/or their relationship to Youssef or Schaback;

- Failed, until approximately November 2018, to designate a compliance officer to ensure day-to-day compliance with AML and KYC programs;

- Failed, until at least June 2019, to provide any training to employees related to AML and KYC; and

- Failed, until on or around November 16, 2019, to file a single suspicious activity report, as required by the BSA, despite knowing that suspicious and criminal activity, including money laundering, was being perpetrated by users through Paxful and despite receiving law enforcement and public requests related to such activity;

- Failed until in or around September 2020 to provide for independent compliance testing or auditing for AML.

As a result of the Defendant's failure to implement an effective AML program, on or about the dates listed below, the Defendant facilitated undercover law enforcement located in the Eastern District of California in opening accounts and conducting trades on the Paxful platform without requiring or receiving any identification or other KYC information beyond an account name and email address:

| Account Opening/Trade Date | Account Name |
| --- | --- |
| Opening: October 14, 2016 | snowbunnyman |
| Trade: October 26, 2016 | snowbunnyman |
| Trade: November 30, 2016 | snowbunnyman |
| Opening: April 1, 2019 | dr.Frosty |
| Opening: April 8, 2019 | Therealpureheroin |
| Transaction: September 23, 2019 | Therealpureheroin |

On or about October 18, 2019, the Defendant, co-conspirators Youssef and Schaback, and others allowed undercover law enforcement located within the Eastern District of California to use the Paxful account "Therealpureheroin" to complete a bitcoin sale despite explicitly referencing selling heroin on the dark net market in a chat session on the Paxful chat platform with the buyer.

Although the Defendant knew it had not established or implemented an AML program, it falsely represented to other companies that it had.  For example, on August 15, 2016, Youssef sent an AML policy, effectively copied from a university's policy, to a separate financial institution where Paxful sought to open an account.  In the policy Youssef provided, the Defendant falsely claimed it "will maintain an anti-money laundering program in accordance with the Bank Secrecy Act, as amended by the USA PATRIOT Act, and other applicable federal laws and regulations;"

that the program "is reasonably designed to prevent Paxful, Inc services from being used to facilitate money laundering and the financing of terrorist activities;" and that the Defendant's AML program included KYC policies, a compliance officer, and training and education of employees. Youssef, Schaback, and Paxful knew this policy was not implemented or enforced at Paxful.

On January 9, 2017, Youssef completed and signed a Corporate Account Application seeking to open an account for the Defendant at another financial institution. In the application, Youssef again falsely claimed, among other things, that the Defendant had KYC and enhanced due diligence ("EDD") policies and procedures in place, conducted risk-based assessments on its customers, had policies and practices in place to report suspicious activity, provided AML training to relevant employees, and regularly conducted internal and independent audits. On February 17, 2017, Schaback and Youssef sent an updated "AML policy," which they knew was not implemented or enforced at Paxful, back to the financial institution where Youssef had submitted the Corporate Account Application.

At other times, the Defendant touted the benefits of its lack of an AML program to prospective customers. For example, on April 14, 2017, Schaback sent an email to a prospective customer, in which he stated that trades on the Paxful platform were "instant and anonymous whereas with exchanges you have to KYC yourself and wait 5 days for bitcoins to arrive." Schaback and Youssef discussed that there were certain controls they would not implement. For example, on December 17, 2017, Schaback sent Youssef a message recommending they not conduct KYC on "small amount buyers."

The Defendant, Youssef, and Schaback knew that Paxful did not have an effective AML program and further knew that, as a result, the platform was transmitting illicit funds, including

funds derived from fraud schemes and scams, as well as illegal prostitution, and other criminal activity, but continued to operate the platform nonetheless.

When employees questioned or complained to Schaback and Youssef about the lack of internal controls and the high levels of fraudulent activity on the platform, Schaback and Youssef minimized the problems or claimed they were working on solutions. The Defendant, however, willfully failed to implement effective internal AML controls or to hire a compliance officer until late 2018. Even after it hired a compliance officer, the Defendant prioritized growth and profit over compliance with the BSA. For example, in or around December 2020, Youssef rejected a proposal by the Chief Compliance Officer to require KYC for all new accounts in a geographic market considered high risk for fraud, allowing the Defendant to open new accounts without identification until a user reached $1,000 in trades. As a result, the Defendant knew that the Paxful platform was at heightened risk for being used to commit money laundering and other criminal activity but willfully failed to implement an effective AML program to mitigate the risks for years. Because the Defendant failed to implement and maintain an effective compliance program, it was also used by criminals to transmit proceeds of child sexual abuse material and hacks by malign nation states.

In July 2015, the Defendant, through Youssef, Schaback, and others, sought to collaborate with www.backpage.com, which the Defendant knew was an online advertising platform for commercial sex services that were illegal in the United States that had lost its ability to use credit card processing services for customer payments. Youssef publicly boasted about what he termed the "Backpage Effect," explaining that Paxful's partnership with Backpage enabled Paxful's business to grow and enabled Backpage customers to continue paying to post advertisements for and facilitate commercial sex. In October 2015, Youssef stated, "[w]e all thought bitcoin traffic

would go down but instead…it is growing faster than ever. Ever[y] minute there are at least 20 transactions from the Paxful wallet to Backpage." In an email on October 5, 2015, Youssef further stated:

> Our little bitcoin startup got flooded with calls from escorts around the world desperate for bitcoin. I personally did support with them for 3 months and the ride was wild. Screaming sducidal [sic] women, babies screaming in the background and calls from angry pimps. We did a video about it with all the live calls. It went viral, for bitcoin anyway.

Through Youssef, Schaback, and others, the Defendant communicated with Backpage employees, including Carl Ferrer, Backpage's co-founder and CEO, to promote and facilitate the business partnership and Backpage customers' use of Paxful to pay for commercial sex advertisements. For example, on July 22, 2015, Youssef sent an email to two Backpage employees listing numerous ways they could increase "conversions"—the number of Backpage customers using Paxful for payment. In the email, Youssef included a link to a Paxful blog entry entitled, "How to Buy Bitcoin for Backpage," and explained that he and others at Paxful were in the process of creating a "step by step tutorial video" specifically for Backpage customers. Thereafter, Paxful created a landing page (i.e., the section of a website accessed by clicking a hyperlink on another web page) to assist Backpage customers seeking to use Paxful as a payment method. In 2015, Paxful also developed and integrated a "Pay With Paxful" widget (i.e., a digital "button" that enables certain functions when clicked) onto www.backpage.com. This widget took Backpage customers directly to the Paxful platform, so that they could open an account.

Through Youssef, Schaback, and others, the Defendant also communicated with Backpage customers and assisted them in setting up Paxful accounts, trading for bitcoin, and sending bitcoin

out to a Backpage wallet to purchase credits to post commercial sex advertisements. For example, in October 2015, Youssef emailed a Backpage customer and provided them with instructions on how to buy bitcoin using a gift card. Other times, Youssef, Schaback, and others at Paxful sent Backpage customers the link to the "How to Buy Bitcoin for Backpage" tutorial. The Defendant also directed and caused its employees to assist Backpage customers, including, unbeknownst to them, undercover law enforcement officers acting as Backpage customers. For example, on October 14, 2016, a Paxful employee provided advice to an undercover agent on how to use bitcoin to post an advertisement on www.backpage.com. On November 22, 2016, another Paxful employee provided advice to an undercover agent about how to connect with Backpage to discuss advertisements; a week later, the agent successfully posted a fake prostitution advertisement on Backpage by using "Pay With Paxful" and bitcoin from a Paxful account.

Employees at Paxful tracked the number of visitors directed to the Paxful platform from www.backpage.com. Through the Defendant's collaboration with Backpage, Paxful caused nearly $15 million worth of bitcoin to be transferred from the Paxful wallet to www.backpage.com between December 2015 and September 2016. In various criminal proceedings, Backpage and its owners and operators admitted that Backpage advertised and profited from illegal prostitution, including illegal sex work depicting minors.

In 2018, the Defendant through Youssef and others, began collaborating with Internet Website 1 as a replacement for Backpage after federal law enforcement took down that website. The Defendant knew Internet Website 1 was an online advertising platform for commercial sex services that were illegal in the United States. Paxful employees contacted Youssef and Schaback about Internet Website 1 after seeing that referrals from Internet Website 1 to the Paxful platform were "going viral," meaning increasing rapidly. In a conversation with Paxful employees in May

2018, Youssef and Paxful employees discussed how, "Backpage is back as '[Internet Website 1]'…who knew girls talk…full PWP [Pay With Paxful] support too…on bright side girls who learnt that system will be coming back through Paxful again." Youssef responded, "Lol [laughing emoticon]," and the employees discussed how they could work with Internet Website 1 but would have to "tread lightly" given the legal issues that arose with their partnership with Backpage.  In another conversation in June 2018, Youssef stated that Paxful would not have "direct" collaboration with Internet Website 1, but would "go through their process and make suggestions" to facilitate business with Internet Website 1.  In another conversation with Paxful employees in June 2018, Youssef stated that he had proactively contacted Internet Website 1's customer support.

Through Youssef and Schaback, the Defendant also directed and caused its employees to assist Internet Website 1 customers, including, unbeknownst to them, an undercover law enforcement officer acting as an Internet Website 1 customer.  For example, on June 8, 2018, a Paxful employee discussed how to dispute a trade with an undercover agent who disclosed that the trade was related to paying for advertisements on Internet Website 1.  The agent explained he had a "couple of girls out of state earning money," that the "girls" were "supposed to send [him] 90% of their profits," and that he provided the money for Internet Website 1.  The Defendant directed and caused the transfer of virtual currency from Paxful to a wallet associated with Internet Website 1, including on or about December 18, 2022, December 20, 2022, and December 29, 2022.

Paxful employees also tracked the number of visitors directed to the Paxful platform from Internet Website 1.  Through the Defendant's collaboration with Internet Website 1, the Defendant caused over $2 million worth of bitcoin to be transferred from the Paxful wallet to Internet Website 1 between approximately July 2018 and December 2022.

As a result of the conduct related to Backpage and Internet Website 1 discussed above, the Defendant obtained profits in the amount of at least $2,750,769 from July 2015 through at least December 2022.

In addition to www.backpage.com and Internet Website 1, the Defendant, through its employees, also communicated about and with other escort websites advertising commercial sex services, including but not limited to a website publicly described as a Backpage alternative, at various times during the conspiracy.

## ATTACHMENT  B

## CERTIFICATE OF CORPORATE RESOLUTIONS

WHEREAS, PAXFUL HOLDINGS, INC. ("PAXFUL") (the "Defendant"), together with its legal counsel, have been engaged in discussions with the United States Department of Justice, Criminal Division, the Money Laundering and Asset Recovery Section ("MLARS"), and the United States Attorney's Office for the Eastern District of California (the "USAO-EDCA") (collectively, the "Offices") in relation to the Offices' investigation of violations of 18 U.S.C. §§ 371, 1952(a)(3), and 1960, and 31 U.S.C. §§ 5318(h), 5322(c), and 5322(e), by the Defendant and certain of the Defendant's employees and agents;

WHEREAS,  in order to resolve such discussions, it is proposed that the Defendant enter into the Plea Agreement with the Offices (the "Agreement");

WHEREAS, the Board of Directors of the Defendant (the "Board") have had the opportunity to receive legal advice from outside counsel for the Defendant, in respect of the terms of the Agreement and of the Defendant's rights, the possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such Agreement with the Offices;

NOW, THEREFORE BE IT RESOLVED by the Board that:

1.     The Defendant (a) acknowledges the filing of the three-count Information charging the Defendant with conspiring to: (i) willfully fail to establish, develop, implement, and maintain an effective anti-money laundering ("AML") program, contrary to 31 U.S.C. §§ 5318(h), 5322(c), and 5322(e); (ii) operate an unlicensed money transmitting business, contrary to 18 U.S.C. §§ 1960(a) and 1960(b)(1)(C); and (iii) violate the Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises Act, contrary to 18 U.S.C. §§ 1952(a)(3) and (a)(3)(A); (b) waives indictment on such charges and enters into the Agreement  with  the  Offices; (c) agrees

Docusign Envelope ID: 7AFFAD4A-AD52-4824-85A1-69F2D45AC80F

to accept a fine of  $4,000,000 and to pay such penalty as required by the Agreement; (d) admits the Court's jurisdiction over the Defendant and the subject matter of such action and consents to the judgment therein; and (e) agrees to undertake certain compliance and disclosure obligations as set forth in the Agreement;

2.      The Defendant accepts the terms and conditions of the Agreement, including, but not limited to: (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Section 3161 of Title 18 of the United States Code, and Federal Rule of Criminal Procedure 48(b); (b) a knowing waiver for purposes of the Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts attached to the Agreement of any objection with respect to venue and consent to the filing of the Information, as provided under the terms of the Agreement, in the United States District Court for the Eastern District of California; and (c) a knowing waiver of any defenses based on the statute of limitations for  any  prosecution relating to the conduct described in the Statement of Facts attached to the Agreement and Information or relating to conduct known to the Offices prior to the date on which the Agreement is signed that is not time-barred  by the applicable statute of limitations on the date of the signing of the Agreement;

3.      Roshan Dharia is hereby authorized, empowered, and directed, on behalf of the Defendant, to execute the Agreement substantially in such form as reviewed by the Board, with such changes as Manfred Bekeris, may approve;

4.      Roshan Dharia is hereby authorized, empowered, and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms, or provisions of any agreement or other documents as may  be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing resolutions; and

Docusign Envelope ID: 7AFFAD4A-AD52-4824-85A1-69F2D45AC80F

5.      All of the actions of the authorized representative of the Defendant which would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Defendant.

Date:   10/24/2025          By:   Signed by:

4943UC8E5DF54DB...

Chairman of the Board
PAXFUL HOLDINGS, INC.

B-3

**ATTACHMENT  C**

**COMPLIANCE COMMITMENTS**

In order to address any deficiencies in their compliance programs, policies, procedures, systems, and internal controls regarding compliance with the Bank Secrecy Act, 31 U.S.C. §§ 5311, et seq. (the "BSA"), anti-money laundering ("AML") laws and regulations, and money laundering laws, PAXFUL HOLDINGS, INC. (the "Defendant"), and PXF GLOBAL CORP. ("PXF Global") agree to conduct in a manner consistent with all of their obligations under this Agreement appropriate reviews of their existing compliance programs, policies, procedures, systems, and internal controls as they relate to the BSA, AML laws and regulations, and money laundering laws (the "Compliance Programs") while operating within the United States or within the U.S. financial system.  Having withdrawn from the United States and U.S. financial system, the Defendant and PXF Global must comply with the AML and terrorist financing laws in the jurisdictions in which they operate.

Where necessary and appropriate, the Defendant and PXF Global agree to adopt new or enhance existing programs, policies, procedures, systems, and internal controls to ensure the Defendant and PXF Global comply with AML and terrorist financing laws in the jurisdictions in which they operate, including the BSA should their operations in the future make them subject to the BSA, and implement and maintain Compliance Programs that guard against money laundering and the financing of terrorism, including by detecting, deterring, and preventing illicit transactions. At a minimum, this will include, but not be limited to, the following elements to the extent they are not already part of the Defendant's and PXF Global's existing Compliance Programs:

*High-Level Commitment to Compliance*

1.      The Defendant and PXF Global will ensure that members of the Defendant's and PXF Global's Boards of Directors, and the Defendant's and PXF Global's directors and senior management provide strong, explicit, and visible support for and commitment to compliance with the Compliance Programs and demonstrate rigorous support for compliance via their words and actions.  The Defendant and PXF Global will also ensure that all levels of management reinforce that commitment to the Compliance Programs and encourage and incentivize employees to abide by the Compliance Programs.  The Defendant and PXF Global will create and foster a culture of ethics and compliance with the law in their day-to-day operations at all levels.

*Policies, Procedures, and Internal Controls*

2.      As part of their Compliance Programs, the Defendant and PXF Global will develop, promulgate, implement, and maintain clearly articulated and visible corporate policies, procedures, systems, and internal controls designed to reduce the prospect of violations of money laundering, terrorist financing, and bank secrecy laws in the jurisdictions in which they operate. This corporate policy shall be memorialized in a written compliance code or codes.  The Compliance Programs shall apply to all directors, officers, and employees of the Defendant and PXF Global and, where necessary and appropriate, outside parties acting on behalf of the Defendant and PXF Global, including but not limited to agents and intermediaries, consultants, representatives, distributors, licensees, contractors and suppliers, and joint venture partners (collectively, "agents and business partners"). The Defendant and PXF Global shall notify all employees that compliance with the Compliance Programs is the duty of individuals at all levels.

3.      The Compliance Programs shall include policies and procedures sufficient to prevent the Defendant and PXF Global from being used for money laundering and terrorist

financing and to meet anti-money laundering and countering terrorist financing standards in the jurisdictions in which they operate. At a minimum, the Compliance Programs shall meet the compliance commitments set forth in this Attachment.

*Transaction Monitoring and Reporting*

4.      As part of the Compliance Programs, the Defendant and PXF Global will institute and enhance their transaction monitoring program, to ensure a transaction monitoring program that includes automated features and is adaptive to identified risks, including risks identified internally at the Defendant and PXF Global, by regulators, from review of publicly available information, and from law enforcement referrals or inquiries. The Defendant and PXF Global will ensure the transaction monitoring program is informed by its risk profile and appropriately accounts for the areas of greatest risk, with particular emphasis on higher-risk products, services, customers, and geographies. The Defendant and PXF Global will regularly review the transaction monitoring program, including its scope, resources, and coverage, and update, test, and tune the transaction monitoring program as needed to ensure it appropriately addresses risk areas.

5.      The Defendant and PXF Global will institute and enhance policies, procedures, and processes for managing alerts identified by its transaction monitoring program, including but not limited to evaluating UTRs, making decisions on suspicious activity reporting consistent with the laws of applicable jurisdictions in which they operate, completing and filing such reports, and monitoring and filing reports on continuing activity. The Defendant and PXF Global will ensure adequate staff is assigned to the identification, research, and reporting of suspicious activities and that part of this review and reporting includes review of customer due diligence and know your customer materials to assess whether activity is suspicious.

6.     The Defendant and PXF Global will establish policies, procedures, and processes for identifying subjects of law enforcement requests, monitoring the transaction activity of those subjects when appropriate, identifying unusual or potentially suspicious activity related to those subjects, and filing, as required in the relevant jurisdictions in which they operate,  reports related to those subjects.

7.     The Defendant and PXF Global will establish policies, procedures, and systems to ensure that assigned personnel file accurate and comprehensive CTRs on all transactions that meet the established parameters in the jurisdictions in which they operate.

8.     The Defendant and PXF Global will generate reports for management review of patterns or outliers in transaction activity, and shall consider, for example, CTR summary reports, funds transfer reports, monetary instrument sales reports, large item reports, significant balance change reports, change in behavior reports, and ATM transaction reports.  Defendant's and PXF Global's management will select filtering criteria and thresholds to produce such transaction reports, subject to periodic review and approval, that will enable the Defendant and PXF Global to detect potential patterns and typologies of unusual activity and management to receive reports of that activity.

9.     The Defendant's and PXF Global's transaction monitoring systems will be independently tested and reviewed for reasonable filtering criteria and thresholds, which review could be included in periodic independent audit of the Compliance Programs and functions.

*Customer and Third-Party Relationships*

10.     As part of the Compliance Programs, the Defendant and PXF Global will institute and enhance appropriate, risk-based customer identification, due diligence, and compliance procedures that are written and approved by the Defendant and PXF Global pertaining to the

C-4

acceptance, retention, and oversight of all accountholders, including, among others, the following minimum requirements:

    a.    procedures for verifying the identity of each customer to form a reasonable belief that it knows the true identity of the customer and where the customer is located, including account-opening procedures detailing the identifying information to obtain from each customer and procedures detailing the use of non-documentary methods to verify the identity of the customer, including, for example: contacting a customer; comparing information provided by the customer with information obtained from a consumer reporting agency, public database, or other source; checking references with other financial institutions; and obtaining a financial statement;

    b.    procedures for making and maintaining a record of all information obtained to identify and verify a customer's identity;

    c.    as part of their Compliance Programs, policies, procedures, and internal controls related to the Defendant's and PXF Global's customer identification and due diligence designed to mitigate and manage money laundering, terrorism financing, and other illicit financial activity risks;

    d.    procedures for periodic review of customer accounts;

    e.    properly documented procedures for closing customer accounts; and

    f.    procedures for retaining and sharing information regarding customers and transactions within the Defendant and PXF Global and with third parties, including law enforcement, to the extent permissible under applicable law.

*Proper Oversight and Independence*

11.    The Defendant and PXF Global will assign responsibility to one or more members of senior management at the Defendant and PXF Global for the implementation and oversight of

the Defendant's and PXF Global's Compliance Programs.  Such members of senior management shall be highly qualified and experienced within the field; shall have the authority to report directly to independent monitoring bodies, including internal audit, and any appropriate management committee or executive of the Defendant and PXF Global; and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.  The duties and responsibilities of such individuals with assigned responsibility for the implementation and oversight of the Defendant's and PXF Global's Compliance Programs shall be documented, approved, and subject to periodic review by the Defendant and PXF Global.

*Insider Risk*

12.     The Defendant and PXF Global will implement and maintain insider risk controls designed to prevent and deter circumvention of the Compliance Programs and violations of law through the Defendant and PXF Global by employees at all levels of the Defendant and PXF Global.  These controls will achieve, among others, the following minimum requirements:

a.     prevent and deter employees from accessing or using the Defendant's and PXF Global's systems in an unauthorized or illicit manner;

b.     prevent and deter employees from accessing or using customer accounts in an unauthorized or illicit manner;

c.     prevent and deter employees from soliciting or receiving bribes, kickbacks, gratuities, or gifts in exchange for conducting certain activities from inside the Defendant and PXF Global; and

d.     prevent and deter employees from conducting or processing transactions in a manner designed to circumvent the Compliance Programs, including the Defendant's and PXF

Global's reporting requirements pursuant to the BSA, or similar laws, as required in the jurisdictions in which they operate.

*Training and Guidance*

13.    The Defendant and PXF Global will implement and enhance mechanisms to effectively communicate their Compliance Programs and all related ethics and compliance policies to all directors, officers, employees, and, where necessary and appropriate, agents and business partners.  These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, all employees in positions that require targeted training (e.g., BSA and AML compliance, internal audit, legal, compliance, retail), and, where necessary and appropriate, agents and business partners; (b) certifications of compliance with training requirements by all directors, officers, employees, and agents and business partners that are subject to the periodic training; and (c) reporting on training requirements and programs to senior management of the Defendant and PXF Global.

14.    The Defendant and PXF Global will provide supplemental training to directors, officers, employees, and, where necessary and appropriate, agents and business partners, when such training is warranted to ensure compliance with the Defendant's and PXF Global's Compliance Programs and all related ethics and compliance policies.  Such circumstances for supplemental training may include, for example, emerging typologies, evolving industry standards, technological developments, and other developments in the field relevant to the adequacy of the Compliance Programs.  In such circumstances, the Defendant and PXF Global will obtain certifications of compliance with the training requirements from such individuals as subject to the supplemental training.

15.     The Defendant and PXF Global will establish an effective policy, procedure, or system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Defendant's and PXF Global's Compliance Programs and all related ethics and compliance policies, and addressing violations of law or of the Compliance Programs, including a channel for guidance and advice on an urgent basis.

*Internal Reporting and Investigation*

16.     The Defendant and PXF Global will implement and maintain a system for internal and, where possible, confidential reporting by directors, officers, employees, and applicable agents and business partners of alleged violations of the Compliance Programs, the BSA, and laws prohibiting money laundering and other forms of illicit finance.  Such system shall include protections against retaliation for the reporting of directors, officers, employees, and applicable agents and business partners.

17.     The Defendant and PXF Global will implement and maintain mechanisms designed to ensure that the system for internal reporting of alleged violations and the related protections against retaliation is effectively communicated to all directors, officers, employees, and applicable agents and business partners.

18.     The Defendant and PXF Global will implement and maintain an effective and reliable process with sufficient resources for responding to, investigating, documenting, and resolving allegations of violations of the Compliance Programs, the BSA, and laws prohibiting money laundering and other forms of illicit finance.

*Enforcement and Discipline*

19.     The Defendant and PXF Global will implement and enhance mechanisms designed to effectively enforce the Compliance Programs and all related ethics and compliance policies. Such mechanisms shall appropriately incentivize compliance and discipline violations.

20.     The Defendant and PXF Global will institute appropriate disciplinary procedures to address, among other things, violations of the Compliance Programs, the BSA, and laws prohibiting money laundering and other forms of illicit finance by the Defendant's and PXF Global's directors, officers, and employees. Such procedures should be applied consistently and fairly, regardless of the position held by or perceived authority of the director, officer, or employee.

21.     The Defendant and PXF Global shall implement procedures to ensure that, where an above-stated violation is discovered, reasonable steps are taken to remedy the harm resulting from such violation and to prevent future similar violations, including, for example, by assessing the Compliance Programs and implementing modifications to the Compliance Programs as necessary to ensure the Compliance Programs are effective.

*Monitoring, Testing, and Audit*

22.     The Defendant and PXF Global will conduct periodic reviews and testing of the Compliance Programs designed to evaluate and improve their effectiveness in complying with the BSA and/or in preventing and detecting violations of laws prohibiting money laundering and other forms of illicit finance in the jurisdictions in which they operate.

23.     Such reviews and testing by the Defendant and PXF Global will involve risk-based assessments of the individual circumstances of the Defendant and PXF Global, and particularly

the money laundering risks facing the Defendant, including, but not limited to, peer-to-peer payment platform activity, evolving industry standards, and any other emerging typologies.

24.    In concert with such reviews and testing, the Defendant and PXF Global shall review and update their Compliance Programs as appropriate, and no less than annually, to ensure their continued effectiveness and risk-tailored resource allocation, considering lessons learned, relevant developments in the industry, and evolving industry standards. The updated Compliance Programs shall be subject to review and approval by the appropriate board of directors and/or board committee(s) of the Defendant and PXF Global.

25.    The Defendant and PXF Global will ensure that the testing and audit functions are accountable to senior management of the Defendant and PXF Global, are independent of the tested or audited activities and functions, and have sufficient authority, skills, expertise, resources, and authority within the organization to effectively review and test the Compliance Programs for compliance with the BSA and laws prohibiting money laundering and other forms of illicit finance.

26.    The Defendant and PXF Global will ensure that they employ testing or audit procedures appropriate to the level and sophistication of the Compliance Programs and that this function, whether deployed internally or by an external party, reflects a comprehensive and objective assessment of the Defendant's and PXF Global's Compliance Programs for compliance with the BSA and laws prohibiting money laundering and other forms of illicit finance.

27.    The Defendant and PXF Global will implement and maintain procedures designed to ensure that, upon learning of an adverse testing result or audit finding pertaining to their Compliance Programs, the Defendant and PXF Global take timely and effective action to identify and implement compensating controls until the root cause of the adverse testing result or audit finding can be determined and remediated.

## ATTACHMENT D

## COMPLIANCE REPORTING REQUIREMENTS

PXF Global Corp. ("PXF Global") agrees that it will report to the United States Department of Justice, Criminal Division, Money Laundering and Asset Recovery Section and the United States Attorney's Office for the Eastern District of California (collectively, the "Offices") periodically. During the Term, as defined in Paragraph 1 of the Plea Agreement, PXF Global shall review, test, and update its compliance program and internal controls, policies, and procedures relating to anti-money laundering, sanctions, and illicit finance, as described in Attachment C. PXF Global shall be required to: (i) conduct an initial review and submit a first report and (ii) conduct and prepare at least one follow-up review and report, as described below. Prior to conducting each review, PXF Global shall be required to prepare and submit a workplan for the review.

In conducting the reviews, PXF Global shall undertake the following activities, among others: (a) inspection of relevant documents, including PXF Global's current policies, procedures, and training materials concerning compliance with money laundering and anti-money laundering laws, prevention of the financing of terrorism, and the detection and prevention of illicit transactions; (b) inspection and testing of PXF Global's systems procedures, and internal controls, including anti-money laundering laws, know your customer, transaction monitoring, record-keeping, and internal audit procedures; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons; and (d) analyses, studies, and comprehensive testing of the PXF Global's compliance program.

***Written Work Plans, Reviews and Reports***

a.        PXF Global shall conduct a first review and prepare a first report, followed by at least one follow-up review and report.

b.        Within sixty (60) calendar days of the date this Agreement is executed, PXF Global shall, after consultation with the Offices, prepare and submit a written work plan to address PXF Global's first review.  The Offices shall have thirty (30) calendar days after receipt of the written work plan to provide comments.

c.        All written work plans shall identify with reasonable specificity the activities PXF Global plans to undertake to review and test each element of its compliance program, as described in Attachment C.

d.        Any disputes between PXF Global and the Offices with respect to any written work plan shall be decided by the Offices in their sole discretion.

e.        No later than one year from the date this Agreement is executed, PXF Global shall submit to the Offices a written report setting forth: (1) a complete description of PXF Global's and the Defendant's remediation efforts to date; (2) a complete description of the testing conducted to evaluate the effectiveness of the compliance programs and the results of that testing; (3) the status of PXF Global's and the Defendant's efforts to exit the U.S. market and cease providing services to customers based in the United States; and (4) its proposals to ensure that its compliance program is reasonably designed, implemented, and enforced so that the program is effective in deterring and detecting violations of money laundering and anti-money laundering laws, preventing the financing of terrorism, and detecting, deterring, and preventing illicit transactions. The report shall be transmitted to:

Chief – Bank Integrity Unit
Criminal Division, Money Laundering & Asset Recovery Section
U.S. Department of Justice
1400 New York Avenue, NW
Bond Building, Tenth Floor
Washington, DC 20005

Criminal Chief
United States Attorney's Office, Eastern District of California
501 I Street, Suite 10-100
Sacramento, CA 95814

PXF Global may extend the time period for issuance of the first report with prior written approval of the Offices.

### *Follow-up Reviews and Reports*

f.      PXF Global shall undertake at least one follow-up review and report, incorporating the views of the Offices on PXF Global's prior review and report, to further monitor and assess whether the Defendant's and PXF Global's compliance program is reasonably designed, implemented, and enforced so that it is effective at deterring and detecting violations of violations of money laundering and anti-money laundering laws, preventing the financing of terrorism, and detecting, deterring, and preventing illicit transactions. The follow-up report shall also address the status of PXF Global's and the Defendant's efforts to exit the U.S. market and cease providing services to customers based in the United States.

g.      The follow-up review and report shall be completed by no later than thirty (30) days prior to the end of the Term set forth in the Plea Agreement.

h.      PXF Global may extend the time period for submission of the follow-up report with prior written approval of the Offices.

D-3

***Confidentiality of Submissions***

g.      Submissions by PXF Global, including the work plans and reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the submissions could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement.  For these reasons, among others, the submissions and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent the Offices determines in their sole discretion that disclosure would be in furtherance of the Office's discharge of their duties and responsibilities or is otherwise required by law.

**ATTACHMENT E**

**DISCLOSURE CERTIFICATION**

To:    United States Department of Justice
Criminal Division, Money Laundering and Asset Recovery Section
Attention: Chief, Bank Integrity Unit

United States Attorney's Office
Eastern District of California
Attention: U.S. Attorney

Re:    Plea Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 12 of the Plea Agreement ("Agreement")

filed on December 8, 2025 in the United States District Court for the Eastern District of California,

by and between the United States Department of Justice, Criminal Division, Money Laundering

and Asset Recovery Section ("MLARS") and the United States Attorney's Office for the Eastern

District of California ("the USAO-EDCA") (collectively the "Offices") and PAXFUL

HOLDINGS, INC. ("PAXFUL") (the "Defendant") and PXF GLOBAL CORP. ("PXF Global"),

that undersigned are aware of the Defendant's and PXF Global's disclosure obligations under

Paragraph 12 of the Agreement and that, to the best of the undersigned's knowledge and belief

(including belief based on representations from others), the Defendant and PXF Global have

complied with their disclosure obligations, as described in Paragraph 12 of the Agreement, which

includes disclosure of evidence or allegations of conduct by the Defendant, PXF Global, their

affiliates, or their employees that may constitute a violation of federal criminal law ("Disclosable

Information"). This obligation to disclose information extends to any and all Disclosable

Information that has been identified through the Defendant's and PXF Global's anti-money

laundering compliance program, sanctions compliance program, whistleblower channel, internal

audit reports, due diligence procedures, investigative processes, or other systems and processes.

The undersigned further acknowledge and agree that the reporting requirement contained in Paragraph 12 and the representations contained in this Certification constitute a significant and important component of the Agreement and the Offices' determination of whether the Defendant and PXF Global have satisfied their obligations under the Agreement.

The undersigned hereby certify that they are respectively an authorized representative of the Defendant and an authorized representative of PXF Global and that each has been duly authorized by the Defendant and PXF Global to sign this Certification on behalf of the Defendant and PXF Global.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of the Defendant and PXF Global to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Eastern District of California. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Eastern District of California.

By: _____      Dated: _____

Title: _____
    PAXFUL HOLDINGS, INC.

By: _____      Dated: _____

Title: _____
    PXF GLOBAL CORP.

**ATTACHMENT  F**

**COMPLIANCE CERTIFICATION**

To:     United States Department of Justice
        Criminal Division, Money Laundering and Asset Recovery Section
        Attention:  Chief, Bank Integrity Unit

        United States Attorney's Office
        Eastern District of California
        Attention:  U.S. Attorney

Re:     Plea Agreement Compliance Certification

The undersigned certify, pursuant to Paragraph 9 of the Plea Agreement (the "Agreement") filed on December 8, 2025 in the United States District Court for the Eastern District of California, by and between the United States Department of Justice, Criminal Division, Money Laundering and Asset Recovery Section ("MLARS") and the United States Attorney's Office for the Eastern District of California ("the USAO-EDCA") (collectively the "Offices") and PAXFUL HOLDINGS, INC. (the "Defendant") and PXF GLOBAL CORP. ("PXF Global"), that the undersigned are aware of the Defendant's and PXF Global's compliance obligations pursuant to Paragraph 9 of the Agreement, and Attachment C to the Agreement and that, based on the undersigned's review and understanding of the Defendant's and PXF Global's Compliance Program as defined in Attachment C, the Defendant and PXF Global have implemented a Compliance Program that meets the requirements set forth in Attachment C to the Agreement.  The undersigned certify that the Defendant's and PXF Global's Compliance Program is reasonably and effectively designed to detect and prevent violations of money laundering laws, laws prohibiting other forms of illicit finance throughout the Defendant's operations, and laws pertaining to anti-money laundering compliance controls and reporting requirements in the jurisdictions in which the Defendant and PXF Global operate.

The undersigned hereby certify, if applicable, that, based on a review of the Defendant's and PXF Global's reports submitted to the Offices, the reports were true, accurate, and complete as of the day they were submitted.

The undersigned hereby certify that they are respectively authorized representatives of the Defendant and PXF Global and have been duly authorized by the Defendant and PXF Global to sign this Certification on behalf of the Defendant and PXF Global.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Defendant and PXF Global to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Eastern District of California.  This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Eastern District of California.

By: _____      Dated: _____

Title: _____
    PAXFUL HOLDINGS, INC.

By: _____      Dated: _____

Title: _____
    PXF GLOBAL CORP.

By: _____      Dated: _____

Title: _____
    PXF GLOBAL CORP.